[No. 31093-7-II.    Division Two.    February 23, 2005.]

THE STATE OF WASHINGTON, *Respondent*, v. CHARLES LAWRENCE KIRKMAN, *Appellant*.

*Lisa E. Tabbut*, for appellant.

*Arthur D. Curtis, Prosecuting Attorney*, and *Kimberley R. Farr, Deputy*, for respondent.

¶1 Bridgewater, J. — Charles Kirkman appeals his conviction of first degree rape of an eight-year-old child. We hold that where there were no physical signs of rape and where the State elicited the examining physician's opinion on the sexual abuse allegations, it amounted to a comment on the victim's credibility. Further, we hold that the detective's testimony detailing a competency examination he gave to the victim was also an opinion on the victim's credibility.

¶2 Admission of these opinions was error of constitutional magnitude because the evidence violated the defendant's right to a jury trial and invaded the fact-finding province of the jury. Thus, these errors can be raised for the first time on appeal under RAP 2.5(a)(3), and because there was no physical evidence or eyewitness testimony, the constitutional errors were not harmless. We reverse and remand for a new trial.

¶3 On December 30, 2002, Kirkman was at Lanae Wyatt's apartment. He had spent the night partying and using methamphetamine with Wyatt and Kirkman's brother, Martin. Kirkman passed out in a chair early in the morning.

¶4 A.D., Wyatt's daughter, was watching cartoons while wearing underwear, shorts and one of her mother's t-shirts while Kirkman slept. When he woke up, Kirkman motioned for A.D. to come to him. She went reluctantly and he picked her up and placed her on his lap. Kirkman's brother, Martin, entered the living room, turned off the television, and then left the room.

¶5 After Martin left the living room, Kirkman took off A.D.'s shorts and underwear and threw them behind the television. He held A.D. upside down with her head on the floor, he then parted the lips of A.D.'s vagina and rubbed between the lips with his finger. A.D. told Kirkman that she needed to use the bathroom several times. At first, he would not let her go, but he finally allowed her to leave.

¶6 A.D. went into the bathroom, got some toilet paper, wet it, and rubbed her vaginal area. She put baby powder on her vaginal area and went into her room and put on clean underwear. She then went back into the living room where Kirkman had fallen back asleep and took the phone, went back to her room and called her aunt, Chantel Landeros.

¶7 A.D. asked Landeros if she could come over to her house but Landeros was sick and did not want to go out into the rain. As the two ended their phone conversation, A.D. told her aunt, "I love you," and Landeros replied, "I love you, too." 2 Report of Proceedings (RP) (July 23, 2003) at 145. This exchange continued two more times until finally A.D. told her aunt that she had a problem and stated that earlier that morning she was on the couch with Kirkman and he had touched her privates. Landeros asked whether Kirkman touched her inside or outside of her underwear and A.D. replied that he had touched her on the inside. Landeros told A.D. that she could not lie because Kirkman

could go to jail and A.D. replied that she was not lying. Landeros replied that she believed her niece.

¶8 Landeros told A.D. that she would call her back and she then called her mother. Landeros' mother told her to go get A.D. and her siblings and then call the police. Landeros called A.D. back and told her to get dressed because she was on her way to get her. Landeros arrived at the apartment around 2:00 P.M. When she walked into the apartment, Kirkman and his girl friend Debbie were sitting and talking. Landeros gathered A.D. and her siblings and left the apartment.

¶9 The State charged Kirkman with one count of first degree child rape on April 29, 2003. Before trial, the court conducted a competency hearing. At the hearing, A.D. testified that Kirkman had touched her vagina and anus. Landeros also testified about the December 30 events. She recalled the statements A.D. made to her when A.D. told her that Kirkman had touched her. The State also called Detective Donald Kerr. Detective Kerr worked for the Child Abuse Intervention Center and had interviewed A.D. about the alleged sexual abuse on January 10, 2003.

¶10 Detective Kerr testified that during his interview with A.D., he asked her if she promised to tell him the truth in the interview and A.D. responded, "I promise." 1 RP (July 15, 2003) at 35. Detective Kerr asked A.D. what happened on December 30, and she mostly repeated what she had told her aunt.

¶11 At the end of the competency hearing, the trial court found A.D. competent to testify. It further held that the statements she had made to Landeros and Detective Kerr were admissible.

¶12 The State's first witness at trial was Detective Kerr. Detective Kerr explained that he gave a competency examination to A.D. to determine her ability to tell the truth. He also obtained her promise to tell the truth before she related what had happened to her. Kirkman did not object to Detective Kerr's testimony.

¶13 The State next called A.D.'s mother, Lanae Wyatt, to testify. Wyatt explained the relationships among the people at her apartment on December 30. Kirkman was the father of her youngest daughter, Kaylie, but Wyatt was dating Martin Kirkman.

¶14 Wyatt testified that on the evening of December 29, she, Martin, and Kirkman partied in her room, smoking methamphetamine, into the early morning hours of December 30. Eventually Kirkman left Wyatt's room and went into the living room.

¶15 On December 30, Wyatt woke up around 9:00 or 9:30 A.M. The Kirkman brothers and her children were at the apartment when she awoke. When she left at 10:00 A.M., Kirkman was asleep in a chair and her children were still asleep in their beds.

¶16 A.D. also testified at trial. Her testimony was similar to her testimony at the competency hearing and her statements to her aunt on December 30.

¶17 Landeros testified about the conversation she had with A.D. on December 30. Kirkman did not object to Landeros' testimony.

¶18 The State also called Dr. John Stirling. Dr. Stirling examined A.D. on February 27, 2003, at the Vancouver Clinic. The State asked Dr. Stirling, "Based upon the physical examination, can you tell us whether you have an opinion within a reasonable degree of medical certainty of whether the physical examination was consistent with the girl's explanation of what occurred?" 2 RP at 173. Dr. Stirling responded that he found nothing in the physical examination to make him doubt A.D., but there was also nothing that would confirm the girl's explanation. Kirkman did not object. The State then asked Dr. Stirling for his general assessment of the case. The doctor replied that the physical examination did not confirm anything, but A.D. gave a clear and consistent history of sexual touching with appropriate affect (" . . . sad when one would expect her to be sad, and reluctant to talk about things that were

embarrassing . . . and the vocabulary seemed to be appropriate for a young lady of her age") and her history was "clear and consistent" with plenty of detail. 2 RP at 176. Again, Kirkman did not object.

¶19 The jury found Kirkman guilty of first degree child rape.

## Opinion Testimony

¶20 Kirkman argues that the trial court denied him a fair trial because it allowed the victim's treating pediatrician, the victim's aunt, and a police detective to testify about A.D.'s credibility.

## A. Dr. Stirling

¶21 Kirkman contends that the State asked Dr. Stirling to state an opinion based on his perception of the victim's truthfulness. He asserts that his case is similar to *State v. Carlson*, 80 Wn. App. 116, 906 P.2d 999 (1995). In Carlson, this court reversed a conviction because the State posed a similar question to the victim's treating physician. "Do you have an opinion within [a] reasonable degree of medical certainty whether the findings that you observed in [E] were consistent with the history of sexual abuse that you were given?" *Carlson*, 80 Wn. App. at 119. The State also asked the doctor about her final assessment of the sexual abuse allegation. *Carlson*, 80 Wn. App. at 120. The doctor responded that she "trusted the interview that [E] had been sexually abused by her father." *Carlson*, 80 Wn. App. at 120. Here, the State followed this question format when the prosecutor asked, "What was then your general assessment of this case?" 2 RP at 175.

¶22 The State attempts to distinguish this case from *Carlson* because Dr. Stirling's response to the State's question was that she gave "a very clear history with . . . lots of detail[,] . . . a clear and consistent history of sexual touching . . . with appropriate affect" and that "[t]he physi-

cal examination doesn't really lead us one way or the other, but I thought her history was clear and consistent." 2 RP at 175-76. But *Carlson* is exactly on point because the answer was in response to the State's question about whether the doctor found the physical exam consistent with the victim's explanation of the event. The State obviously knew about *Carlson*, for the prosecutor in *Carlson* was also the prosecutor here. The State argues that in *Carlson*, the doctor said she trusted the interview and that this did not occur here. We hold that this is a distinction without a difference; the physician testified that A.D.'s report of sexual touching was clear, consistent, with appropriate affect, and that she used appropriate vocabulary. The physician was clearly commenting on A.D.'s credibility.

## B. Detective Kerr

¶23 Kirkman next asserts that the court allowed Detective Kerr to tell the jury that he believed the victim's allegations.

¶24 Detective Kerr explained the procedure he followed to conduct child abuse interviews. He also testified about the specifics of his interview with A.D. During his testimony, Detective Kerr often read the questions he asked A.D. and her responses. He never affirmatively stated that he believed A.D.'s allegations.

¶25 But, Detective Kerr testified in detail about a competency examination he gave to A.D. that related to her ability to tell the truth and he extracted her promise to tell the truth. Detective Kerr was asked if he did anything before he asked A.D. questions about what happened. His answer was, "Yes . . . it's kind of a competency." 2 RP at 73. The State then asked why he would ask A.D. to give an example of a lie or of truth. He responded, "[b]ecause I'm—I'm interested in—in this person being able to distinguish between truth and lies." 2 RP at 74. The State also asked if A.D. understood the importance of telling the truth, and if A.D. was able to distinguish between the truth and a

lie and provide examples. Detective Kerr responded that she was, and then said that she promised to tell him the truth. At that time, he related what she said in her interview.

¶26 Detective Kerr did not offer his direct opinion on A.D.'s credibility, but he told the jury that he tested A.D.'s competency and her truthfulness. In essence, he told the jury that A.D. told the truth when she related the incriminating events to him. This is significant because a police officer's testimony may particularly affect a jury because of its "special aura of reliability." *State v. Demery*, 144 Wn.2d 753, 765, 30 P.3d 1278 (2001); *State v. Saunders*, 120 Wn. App. 800, 813, 86 P.3d 232 (2004). And it is significant because a witness may not give an opinion on another witness's credibility. *Carlson*, 80 Wn. App. at 123.

¶27 In determining whether the statements by Dr. Stirling and Detective Kerr are improper opinion testimony, we consider the totality of circumstances in the case, including: "(1) 'the type of witness involved,' (2) 'the specific nature of the testimony,' (3) 'the nature of the charges,' (4) 'the type of defense, and' (5) 'the other evidence before the trier of fact.' " *Demery*, 144 Wn.2d at 759 (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994)). Here, A.D. was eight years old, she claimed Kirkman sexually assaulted her, the charged offense was first degree child rape, Kirkman denied the accusation, and his witnesses testified that they did not witness any sexual activity on his part because he was asleep, and there was no other evidence of guilt. Under these circumstances, the opinion testimony from Dr. Stirling and Detective Kerr was improper.

## C. Chantel Landeros

¶28 Kirkman also asserts that the trial court erred by allowing Landeros to comment on A.D.'s credibility. But, the State did not ask Landeros' opinion of her niece's credibility. Instead, it asked her to relate the conversation she had

with her niece. Landeros' recitation was the precursor to the report to the police. It was not an opinion of A.D.'s credibility, nor was it relied on for that purpose.

█ ¶29 *State v. Demery*, 144 Wn.2d 753, is instructive. An opinion that explains the context of what was said in an interview, is not an opinion about credibility but is a technique useful to obtain factual statements. *Demery*, 144 Wn.2d at 765. This was not an improper comment on the victim's credibility.

### D. Failure to Object

█ ¶30 Kirkman failed to object at trial to the admission of the objectionable testimony. Generally, we do not consider issues raised for the first time on appeal. RAP 2.5(a). But, if the defendant alleges a manifest error that affects a constitutional right, the issue can be raised for the first time on appeal. RAP 2.5(a)(3). Because improper opinion testimony violates a constitutional right, it generally may be raised for the first time on appeal. *Saunders*, 120 Wn. App. at 811. Improper opinion testimony violates the defendant's right to a jury trial and invades the fact-finding province of the jury. *State v. Dolan*, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003).

█ ¶31 We employ a four-part analysis to decide whether a manifest error exists: (1) does the alleged error present a constitutional issue; (2) is it manifest, that is, did it have "practical and identifiable consequences"; (3) what are the merits of the constitutional issue; and (4) was the error harmless. *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

¶32 *Dolan*, *Demery*, and *Saunders* establish that improper opinion testimony violates a constitutional right. The first prong of the analysis is met. Within the meaning of RAP 2.5, "manifest" means "unmistakable, evident or indisputable." *Lynn*, 67 Wn. App. at 345. Manifest errors are those that had "practical and identifiable consequences in the trial of the case." *Lynn*, 67 Wn. App. at 345. These

errors are manifest. This case rested on the credibility of A.D. and there was no other evidence apart from her statements. By bolstering A.D.'s testimony through Dr. Stirling and Detective Kerr, the jury was told that they could believe her. Her credibility was essential to convict Kirkman.

¶33 Finally, we examine whether the evidence was harmless. "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). We employ the "overwhelming untainted evidence" test to determine if the error was harmless. *Guloy*, 104 Wn.2d at 426. We examine whether the untainted evidence is so overwhelming that it leads necessarily to a finding of guilt. *Guloy*, 104 Wn.2d at 426.

¶34 Here, there is no evidence other than the statements of A.D. At best, the evidence is that A.D. repeated the same factual recitation to her aunt, the physician, and the policeman. Her credibility is for the jury to decide. Because there was not overwhelming untainted evidence of Kirkman's guilt, the improper opinion evidence invaded the province of the jury, and review under RAP 2.5(a)(3) is warranted. When the error is not harmless, we reverse and remand for a new trial. *State v. Barr*, 123 Wn. App. 373, 383, 98 P.3d 518 (2004).[1]

¶35 Reversed and remanded for a new trial.

HOUGHTON, J. concurs.

¶36 QUINN-BRINTNALL, C.J. (dissenting) — On appeal, Kirkman alleges that his conviction must be reversed because three witnesses testified to their opinions regarding the victim's credibility. At issue is the testimony of Dr. Stirling, who testified that the results of the physical

---

[1] Because of our holding that the improper opinion evidence merits reversal and we remand for trial, we do not address the ineffective assistance of counsel claim.

examination he performed were consistent with A.D.'s explanation of what occurred; A.D.'s aunt's testimony relating the conversation, in which A.D. disclosed that she had been sexually abused; and the testimony of Detective Kerr, who related his interview with A.D. and testified about his informal competency evaluation of A.D. before that interview. Kirkman did not object to any of this testimony.

¶37 Essentially, Kirkman argues that he may raise these issues for the first time on appeal because they are (a) manifest errors of constitutional magnitude that violated his right to a jury trial and invaded the fact-finding province of the jury and (b) because his trial counsel was ineffective for failing to object to the errors at trial. The majority holds that Stirling's and Kerr's statements are manifest errors that invaded the fact-finding province of the jury and thus can be challenged for the first time on appeal under RAP 2.5(a)(3). I disagree and dissent.

¶38 Stirling's testimony set forth his expert opinion on the results of his physical examination of A.D. He stated:

> I'm trying to think of how to phrase this. I found nothing on the physical examination that would make me doubt what she'd said, [n]or was there anything that would necessarily confirm it. There was no damage, it was a normal examination.

2 RP at 173. Stirling testified that his physical findings neither corroborated nor undercut A.D.'s account. Provided that it was relevant, such testimony was proper. *See State v. Carlson*, 80 Wn. App. 116, 129 n.44, 906 P.2d 999 (1995) (citing ER 702).

¶39 Kerr's testimony about his interview with and competency evaluation of A.D. are of greater concern. But Kerr's testimony, belatedly challenged, is an account of the interview techniques he used to obtain the victim's statement. He testified as follows:

> [Kerr]: . . . I ask [young children] questions like, you know, Can you give me an example of a lie or give me an example of truth?
> [The State]: Now, why would you do that?

[Kerr]: Because . . . I'm interested in . . . this person being able to distinguish between truth and lies and making things up or exaggeration, and . . . [I] explain to them the importance of this and that they tell me the truth when they're talking to me.

2 RP at 74. But at no time did Kerr state affirmatively that he believed the victim's allegation.

¶40 A party may assign evidentiary error on appeal only on the specific ground made at trial. *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). This gives a trial court the opportunity to prevent or cure error. *See State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). But by failing to object to or move to strike the allegedly erroneous evidence, Kirkman did not give the trial court such an opportunity. Thus he did not preserve the issue for our review.

¶41 On appeal, Kirkman seeks to avoid issue preservation requirements merely by asserting a constitutional basis for the alleged error: he claims it "violates the defendant's constitutional right to a fair trial." Br. of Appellant at 13.

¶42 An unpreserved manifest constitutional error is reviewable on appeal. RAP 2.5(a)(3); *State v. Scott*, 110 Wn.2d 682, 686, 757 P.2d 492 (1988). But RAP 2.5(a)(3) does not provide that *all* asserted constitutional claims may be raised for the first time on appeal, especially considering that criminal law is so largely "constitutionalized" that most claimed errors can be phrased in constitutional terms. *See State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992). In my view, the majority applies this narrow manifest constitutional error exception too broadly.

¶43 In order to reach an issue as a manifest constitutional error, we must first undertake a four-step analysis: We (1) determine whether the error raises a constitutional

issue and (2) determine whether the error is manifest.[2] If the error is manifest, we may then (3) address the merits of the issue. Finally, if a constitutional error was committed, we (4) apply a harmless error analysis. *Lynn*, 67 Wn. App. at 345; *State v. Jones*, 71 Wn. App. 798, 809-10, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994). Thus, the exception to the preservation requirement is actually a narrow one, affording review only of certain constitutional questions. *Scott*, 110 Wn.2d at 687 (citing RAP 2.5 cmt. (a), 86 Wn.2d 1152 (1976)). *See also City of Seattle v. Heatley*, 70 Wn. App. 573, 584, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994).

¶44 In *Heatley*, the defendant, citing *State v. Carlin*, 40 Wn. App. 698, 700 P.2d 323 (1985), contended that the admission of an opinion on a criminal defendant's guilt is a "manifest error affecting a constitutional right" under RAP 2.5(a)(3) that may be raised for the first time on appeal. *Heatley*, 70 Wn. App. at 583. Although the *Heatley* court had already determined that the challenged testimony was not an opinion on guilt, the court explicitly *rejected* its prior holding in *Carlin* that the admission of testimony that was allegedly an opinion on guilt was an error of constitutional magnitude that could automatically be raised for the first time on appeal. In overruling its prior reasoning, Division One stated:

> In *Carlin,* a police officer testified without objection that a police dog had located the defendant by following a "fresh guilt scent". 40 Wn. App. at 700. On appeal, this court held that the "expression of an opinion as to a criminal defendant's guilt violates his constitutional right to a jury trial" by "invading the province of the impartial fact finder." *Carlin*, 40 Wn. App. at 701-02. However, *Carlin* provides no analysis and cites no relevant authority for the proposition that this is the type of "manifest error" contemplated by RAP 2.5(a)(3).
>
> Moreover, the court in *Carlin* did not expressly decide that the "fresh guilt scent" testimony actually constituted an opin-

---

[2] "Manifest" means unmistakable, evident, or indisputable, as distinct from obscure, hidden, or concealed—the error must have had "practical and identifiable consequences in the trial of the case." *Lynn*, 67 Wn. App. at 345.

ion on the defendant's guilt. *See Carlin,* 40 Wn. App. at 703 (testimony "arguably" was an improper opinion). Instead, the court held that even if the testimony was error, it was harmless beyond a reasonable doubt. *Carlin,* 40 Wn. App. at 705. This approach, which eschews analysis of whether the claimed error is "truly of constitutional magnitude", has been superseded by decisions . . . attempting to give meaning to the concept of a "manifest" constitutional error that will be reviewed for the first time on appeal.

*Heatley,* 70 Wn. App. at 583-84 (footnote omitted).

¶45 This court has produced inconsistent opinions on whether admission of a witness's opinion testimony on the veracity of another witness constitutes manifest constitutional error. *Compare State v. Mendoza-Solorio,* 108 Wn. App. 823, 834-35, 33 P.3d 411 (2001) (assuming, without deciding, that the facts raised a manifest constitutional error but finding error harmless), *with State v. Wilber,* 55 Wn. App. 294, 298, 777 P.2d 36 (1989) (analyzing officers' testimony as to witness's credibility as improper expert opinion testimony under ER 702 and not of "constitutional magnitude," and stating that "[a]rguably, the officers' opinions are also, inferentially, opinions on the defendant's guilt. However, to take such an expansive view of the prohibition against opinion testimony on the guilt of a defendant is unnecessary.").

¶46 Recently, in *State v. Dolan,* 118 Wn. App. 323, 73 P.3d 1011 (2003), after holding (1) that the defendant had been denied his right to present evidence of his accuser/girl friend's bias and (2) that the police officer and case worker had improperly been allowed to express their baseless opinions that Dolan's girl friend, the mother of the injured child, was not responsible for the child's injuries, we added:

[A] witness may not give, directly or by inference, an opinion on a defendant's guilt. [*State v. Madison,* 53 Wn. App. 754, 760, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989).] To do so is to violate the defendant's constitutional right to a jury trial and invade the fact-finding province of the jury. [*State v.*

*Demery,* 144 Wn.2d 753, 759, 30 P.3d 1278 (2001) (plurality opinion).]

*Dolan,* 118 Wn. App. at 329.

¶47 But in *Madison,* relied on by *Dolan,* Division One found no manifest constitutional error and held that because the defense had failed to object to the statements of a caseworker indicating that she believed the alleged child rape victim's story, the issue was not preserved for appeal. *Madison,* 53 Wn. App. at 762-63.[3] And *Demery,* also cited in *Dolan,* involved officers' taped statements that, according to the plurality, did not even amount to "testimony." *Demery,* 144 Wn.2d at 765.

¶48 Here, Stirling's and Kerr's testimony did not comment directly on Kirkman's guilt. Nor was either witness's testimony a direct comment on the innocence of another suspect, as in *Dolan.*

¶49 The State asked Kerr to describe generally the interview with A.D. Kerr's testimony expressed his personal belief that he performed a competency evaluation, determined that A.D. was capable of distinguishing between the truth and a lie, and obtained a promise from her that she would tell the truth. But he never gave an opinion on A.D.'s credibility or expressed his belief in the truth of her account.

¶50 Kerr's personal feelings on his own proficiency in determining a child victim witness's competency probably are irrelevant, but his testimony is not *improper* in the sense that Kirkman suggests. The testimony does not usurp the jury's authority any more than, for example, the trial court's determination of a child victim's competency or the process of having the child take an oath and promise to tell the truth, which occur in the jury's presence. Stirling's and

---

[3] Likewise, in *State v. Stevens,* 58 Wn. App. 478, 495, 794 P.2d 38, *review denied,* 115 Wn.2d 1025 (1990), Division One cited *Madison* and again held that a defendant failed to preserve for review his objection to a caseworker's testimony that it was unusual for young children to lie when disclosing sexual abuse. *Cf. State v. Jerrels,* 83 Wn. App. 503, 507, 925 P.2d 209 (1996) (reversing conviction based on prosecutorial misconduct where prosecutor asked mother whether she thought her children were telling the truth).

Kerr's statements, if improper, do not rise to the level of a manifest constitutional error affecting Kirkman's right to a fair trial.

¶51 It is up to the jury to determine the credibility of the witnesses and the reliability of their testimony. *See, e.g.*, *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). But nothing in this record suggests that Stirling's or Kerr's testimony interfered with that function. Moreover, Kirkman's counsel did not object to the testimony now being challenged. In my view, no manifest error of constitutional magnitude appears in the record and Kirkman has not preserved these evidentiary issues for our review.

¶52 As a fall-back position, Kirkman claims that a reasonably competent defense counsel would have objected and that his attorney was constitutionally ineffective for failing to do so. To show ineffective assistance of counsel, an appellant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced her. *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). Deficient performance occurs when counsel's performance falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). Prejudice occurs when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

¶53 Thus, he seeks to bootstrap review of the propriety of Stirling's and Kerr's testimony onto such a claim. But the record here suggests that Kirkman's counsel had a tactical reason for not objecting.

¶54 During her testimony, Cassandra Carpenter, the victim's 10-year-old friend, volunteered that she did not believe A.D. when she told her about the abuse. It appears that Kirkman's counsel made a tactical decision to attempt to admit testimony of A.D.'s reputation for truthfulness and that this tactic would be more likely to succeed if the State were allowed to admit testimony relating to others' beliefs in

the victim's account. In my view, Kirkman's counsel needed to allow the State to present opinion-like (or even opinion) testimony in hopes that the trial court would level the playing field by permitting the defense to present evidence of the child's reputation for untruthfulness and specific opinions on her veracity. Thus, even if the challenged testimony were equivalent to opinion testimony on the defendant's guilt—which I do not believe it was—defense counsel had tactical reasons not to object to Kerr's irrelevant testimony regarding the preinterview competency examination and was not ineffective.

¶55 In sum, while I strongly disapprove of the State's proffer of the irrelevant testimony, its unchallenged admission is not a manifest constitutional error that deprived Kirkman of his right to have the jury determine eight-year-old A.D.'s credibility. I would uphold the jury's credibility determinations and affirm Kirkman's convictions.

Review granted at 155 Wn.2d 1014 (2005).