[No. 55081-1-I.   Division One.   January 23, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. JEREMY MONROE KING, *Appellant*.

*Jeremy M. King*, pro se.

*Oliver R. Davis* (of *Washington Appellate Project*), for appellant.

*Janice E. Ellis, Prosecuting Attorney*, and *Charles F. Blackman, Deputy*, for respondent.

¶1 AGID, J. — A jury convicted Jeremy King of one count of first degree child molestation and one count of first degree child rape. During the trial, King moved for a mistrial after a Child Protective Services (CPS) investigator referred to his status as a registered sex offender in

violation of the trial court's order in limine excluding all references to King's prior sexual offenses. The trial court denied King's motion and later denied his posttrial motion for a new trial. King appeals. Although the improper remark was a serious irregularity, the evidence against King—including the victim's consistent, detailed disclosures and the physical evidence of penetration—was strong. We cannot say that the trial court abused its discretion in failing to grant King a new trial. Further, because the witnesses who interviewed the child did not explicitly say they believed his testimony, any error in allowing their testimony was not manifest and we will not consider the issue for the first time on appeal. We affirm.

## FACTS

¶2 In late April and early May 2003, nine-year-old D.S., his parents, and his two sisters lived in Noel Sterling's Edmonds home along with several other people. Drug use at the house, including by D.S.'s parents, was rampant. It is disputed whether 23-year-old Jeremy King resided at or simply frequented the house. On Friday, April 25, 2003, D.S. was in a minor motorcycle accident while riding with Sterling. On Thursday, May 1, King was arrested at the house for failing to register as a sex offender. On May 23, D.S. told his teacher and a school counselor that Sterling had shot a gun in the house, and the school alerted the police and CPS. Police found drugs, drug paraphernalia, and pornography at the house. CPS removed D.S. and his sisters and later that day placed them with their grandmother, Margaret Seward.

¶3 That same evening, D.S. allegedly told Seward that he had been hurt and touched inappropriately. He did not give details but identified the perpetrator, although Seward was confused about who it was. Seward called CPS, and on May 30, CPS investigator Kara Rozeboom went to Seward's home and interviewed D.S. alone in a bedroom. D.S. told her that "Jeremy" (King) was arrested for "molesting" him.

He described how he and King rode bikes to the skate park, and after playing tag, King started to touch him all over. King took off D.S.'s pants, stuck his finger and penis into D.S.'s anus, and also touched D.S.'s penis.

¶4 On July 3, 2003, Detective Michael Richardson interviewed D.S., who told him that King had molested him a couple months earlier off a trail in the woods at the skate park. King had touched his crotch and buttocks areas. Both of their clothes were off, and he told King to stop, but King told him that if he told anyone the State would take him away. D.S. said King's penis was long and hard, he put it in his "butt" about five times, and it hurt a little. It felt like King was peeing in his butt, and it was wet and sticky. When King heard someone on the trail, they got dressed, walked back to the skate park, and went back to Sterling's house. D.S. said this happened a day or two before King was arrested, and they never went back to the skate park again. During the drive home after the interview, D.S. told his grandmother that King took him to the woods at the skate park and pushed him onto the ground and held him down. King then put his penis in D.S.'s "rearend," and there was sticky stuff all over that was hard to clean off.

¶5 On July 25, 2003, nurse practitioner Barbara Haner interviewed D.S. at the Providence Everett Sexual Assault Center. Haner asked D.S. if he knew why he needed a checkup, and he told her it was "because of Jeremy." Using a doll, he showed her how King put his penis in his "butt," and he said white sticky stuff came out of King's penis. King told him not to tell anyone. D.S. said it happened just that one time. D.S. also said there were a lot of drugs in his house and that the drugs were made next door or at his house. Haner then asked him if he wanted to tell her anything else, and he said, "if they say my dad did stuff, it's not true, they just heard me say stuff, I said my dad by mistake." Nurse Gretchen Weiss-Elliot then performed D.S.'s physical examination and discovered anal fissures and engorged blood vessels around his anus, both of which could result from a history of constipation, prolonged bearing down, or anal penetration.

¶6  Detective Richardson conducted a follow-up interview on September 17, 2003. Because D.S. did not want to talk, Richardson asked several leading and suggestive questions about things D.S. had said during their first interview. Eventually D.S. confirmed most of his statements from the first interview, although he said King never told him that the State would take him away if he said anything. D.S. said it happened just that one time, about a week after the motorcycle accident.

¶7  On February 12, 2004, defense investigator Todd Dawson interviewed D.S., who told Dawson he had gone to the skate park several times with King and that the incident had happened during the afternoon and not on a school day. He could not remember exactly what day it was, but it was not the day of the motorcycle accident. He did not see King's penis because he was turned around. King had him get on his hands and knees and then put his penis in his "butt hole."[1] It hurt, and King told him to shut up or he would hit him. After they left the park, he got ice cream with King. He said he never told his grandmother what happened. Dawson checked with D.S.'s school and learned that D.S. was present in class on Monday, April 28, through Thursday, May 1. The previous week he was absent every day except Thursday, April 24.

¶8  Police learned from the defense interview that D.S. said King raped him in two different places off the trail. On March 25, 2004, the police took D.S. to the skate park and he showed them the two places where the rape occurred. The State charged King with one count of first degree child molestation and one count of first degree child rape, occurring on or about April 25, 2003 to May 1, 2003. Before trial, King moved to exclude all references to his being a sex offender or a registered sex offender. The trial court granted the motion, stating that the prosecutor "should do every-

---

[1] D.S. did not tell Dawson about the particulars of the assault in words, but instead wrote them down.

thing she can to make sure the witnesses [do not] inadvertently mention the defendant's prior record."[2]

¶9  At trial, D.S. testified that he and King would ride their bikes to the skate park and play basketball. One day they took a trail into the woods, and King took his clothes off and then made D.S. take his clothes off. D.S. was sitting down when King touched his penis, and King then had him get on his hands and knees with King behind him. D.S. could not see what was happening, but he felt King's penis touch his "butt" and it hurt. King moved it in and out until he heard people approaching, at which point they moved to a different spot off the trail and King put his penis in D.S.'s butt again. Sticky white stuff came out of King's penis. D.S. could not remember King saying anything to him while King was behind him. That was the only time it happened, and afterwards they went back to Sterling's house. D.S. did not tell anyone about it when they got back because King was there. D.S. did not see King again after he was arrested on May 1.

¶10  D.S. said the incident happened after the day of the motorcycle accident (April 25), and he first told his mother about it a few days afterwards. The second person he told was his grandmother after he went to stay with her. No one other than King had ever done anything like that to him. On cross-examination, D.S. said he went to the park three times with King. He agreed that he told Dawson that the incident happened in the afternoon and did not happen on a school day. King did not tell him to shut up, and they did not stop for ice cream on the way home. He did not see King get arrested on May 1, but someone told him about it. He said that he never told Rozeboom about what happened. D.S. said he heard the word "molest" from television and also overheard his mom and grandmother use that word twice in conversation, once at the grandmother's house and once at Sterling's house.

---

[2] The parties agreed that King's May 1, 2003 arrest for failure to register would be referred to only as an arrest on a warrant.

¶11 D.S.'s mother, Kristina Grant, testified that on May 4, 2003, D.S. told her that someone had touched him inappropriately.[3] Grant did not report this to CPS and later lied about it to police, fearing that her failure to disclose would look bad to CPS. She also said that after she heard King had been in a fight in front of D.S. on April 25, 2003—the same day D.S. was later in the motorcycle accident with Sterling—she did not trust King anymore and did not allow D.S. to go to the skate park with him.

¶12 Seward, Rozeboom, Detective Richardson, Haner, and Dawson all testified about what D.S. told them. Weiss-Elliot said that an anal injury may or may not be evident three months after the incident and that D.S.'s conditions were consistent with being penetrated. On cross-examination, Weiss-Elliot agreed that things other than anal penetration could have caused D.S.'s condition. During Rozeboom's testimony, the prosecutor asked why she had gone to see D.S. on May 30, 2003:

Q: And as far as [D.S.] is concerned, what was the reason you were called out to see [D.S.] that day [May 30, 2003]?

A: Because the grandmother, Margaret Seward, had told me on the phone on May 28—

Q: I don't need to know—I'm sorry, I should make my questions more clear. I don't need to know everything Margaret told you. I just need to know what was the concern that brought you out there?

A: That [D.S.] had been molested by a known registered sex offender named Jeremy King.

MR. MCCARDLE [defense counsel]: Objection, nonresponsive. Move to strike.

THE COURT: All right. Well, ladies and gentlemen, she just said a known registered sex offender. She has no knowledge of that. That's something that we've discussed pre-trial. You're to disregard that label and put

---

[3] Before trial, the court held a child hearsay hearing and ruled that all witnesses were allowed to testify as to what D.S. told them, except Grant, who was allowed to testify under the "hue and cry" doctrine only to the generic fact that D.S. had disclosed abuse to her.

no weight on her testimony whatsoever on that issue. All right. Let's get back on track please.

Q (By Ms. Kristof [prosecutor]): Did you go out to talk to [D.S.] because you were concerned he had been molested?

A: Yes.

¶13 Shortly thereafter, King moved for a mistrial because Rozeboom's testimony violated the court's order in limine and "the words 'registered sex offender' [had] been linked inextricably with Jeremy King in the jury's mind." The trial court agreed that "suggesting that Mr. King has a prior sex offense in his history is extremely prejudicial during a trial for a sex offense" but ultimately denied King's motion without further instructions to the jury.[4]

¶14 Andrea Mueller testified that she was with King on Sunday, April 27, 2003, from around noon or 1 PM until about 8 or 9 PM. They drove from Edmonds to North Bend and Snoqualmie Falls, had dinner in North Bend, spent some time at her place in Everett, and then she dropped him off in Edmonds. Jamie Swenson, King's ex-girlfriend, testified that she saw a movie with D.S. and several others the afternoon of April 26, 2003. She saw King and D.S. together in the skate park on numerous occasions in the two weeks leading up to April 25, 2003, but did not see them after that. King did not testify.

¶15 The jury convicted King on both counts, and he moved for a new trial based on Rozeboom's remark. The court held a hearing and analyzed the facts under the three-part *State v. Escalona*[5] test. It ruled that although Rozeboom's statement was a serious irregularity, it did not warrant a new trial. The court sentenced King to 198 months of incarceration for the molestation count and 300 months of incarceration for the rape count, to be served concurrently.

---

[4] While defense counsel thought a firmer instruction would be better than no further instruction at all, he did not argue with the State's position that such an admonition would be an unfair comment on the evidence.

[5] 49 Wn. App. 251, 742 P.2d 190 (1987).

## DISCUSSION

*Opinion Testimony*

¶16 King argues for the first time on appeal that Detective Richardson, Rozeboom, and Haner vouched for D.S.'s credibility. Experts may not state an opinion about a victim's credibility because such "testimony invades the province of the jury to weigh the evidence and decide the credibility of witnesses."[6] We have previously held that where a witness does not explicitly state his or her belief in the victim's story, the testimony does not constitute manifest constitutional error.[7] But King relies on *State v. Kirkman*,[8] Division Two's recent split decision allowing the defendant to raise the issue for the first time on appeal even though a detective never affirmatively stated his belief in the child victim's allegations. We must decide whether to follow our own precedent and Chief Judge Christine Quinn-Brintnall's dissent in *Kirkman* or the majority opinion in *Kirkman*.

¶17 In *State v. Madison*,[9] Madison did not object at trial to CPS caseworker Schuller-Roth's testimony that the alleged victim's masturbation was " 'typical of a sex abuse victim'; that when [the victim] spoke to her 'it was obvious she was very relieved, very comfortable that she was not needing to maintain the secret', and that [the victim] waited to make her accusations because 'she was very clearly aware of the impact her disclosure would have on the many people whom she loved'."[10] Madison argued the issue could be raised for the first time on appeal because the testimony equaled a statement of belief in the victim's story. Although the statements would properly have been subject to an objection or motion to strike, we held that allowing

---

[6] *State v. Jones*, 71 Wn. App. 798, 812, 863 P.2d 85 (1993) (citing *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992); *State v. Madison*, 53 Wn. App. 754, 760, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989)), *review denied*, 124 Wn.2d 1018 (1994).

[7] *Id.* at 812-13 (citing *Madison*, 53 Wn. App. at 762-63).

[8] 126 Wn. App. 97, 107 P.3d 133, *review granted*, 155 Wn.2d 1014 (2005).

[9] 53 Wn. App. 754, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989).

[10] *Id.* at 760.

Schuller-Roth's testimony was not manifest constitutional error because she "neither asserted that Madison was guilty nor explicitly asserted that she believed [the victim's] story."[11]

¶18 In *State v. Jones*,[12] the victim told CPS caseworker Mitchell that Jones had sexually abused her. Jones did not object at trial to Mitchell's testimony that the victim said to her, " 'Believe me, believe me, I am telling you that this happened,' " and that she replied, " 'I believe you.' "[13] We held that Mitchell's statement, taken in the context of the surrounding testimony, was intended to reassure the child to encourage her to respond and it was not a statement to the jury that Mitchell believed her. We noted that even if the remark were the proper subject of an objection, this issue could not be raised for the first time on appeal unless it was manifest constitutional error. Citing *Madison*, we held that Jones could not raise the issue because "Mitchell did not expressly state to the jury that she believed [the victim] . . . ."[14]

¶19 In *Kirkman*, Detective Kerr testified that he gave the victim a competency test to determine if she could distinguish between truth and lies. The State asked him if the victim understood the importance of telling the truth and whether she could distinguish between the truth and a lie.[15] He responded that she could, and she promised to tell him the truth. Division Two held that even though Kerr did not offer his direct opinion on the victim's credibility, by telling the jury that he tested her competency and truth-

---

[11] *Id.* at 763.

[12] 71 Wn. App. 798.

[13] *Id.* at 804. Jones did object to the prosecution's question that elicited Mitchell's statement that " 'I felt that this child had been sexually molested by [Jones] at that point.' " *Id.* We held that although this was an explicit statement of belief in Jones' guilt, the error was harmless because other evidence of Jones' guilt was overwhelming. *Id.* at 813.

[14] *Id.* at 813.

[15] *Kirkman*, 126 Wn. App. at 104-05.

fulness, he essentially told the jury that the victim told the truth when she gave her account of events to him.[16]

¶20 In her dissent in *Kirkman*, Chief Judge Quinn-Brintnall argued that the majority incorrectly considered the issue for the first time on appeal because Kerr's testimony

> expressed his personal belief that he performed a competency evaluation, determined that [the victim] was capable of distinguishing between the truth and a lie, and obtained a promise from her that she would tell the truth. But he never gave an opinion on [the victim's] credibility or expressed his belief in the truth of her account.
>
> . . . The testimony does not usurp the jury's authority any more than, for example, the trial court's determination of a child victim's competency or the process of having the child take an oath and promise to tell the truth, which occur in the jury's presence. . . .[17]

¶21 Here, Detective Richardson's and Rozeboom's testimonies are similar to Kerr's testimony in *Kirkman*.[18] Richardson testified about his child-interview training and how he begins every interview by establishing ground rules to ensure the child knows the difference between a truth and a lie and that they know they are only supposed to tell him the truth. The State asked Richardson if he was satisfied that D.S. understood the ground rules for the interview, and Richardson said yes. After establishing the ground rules, Richardson began the interview by asking D.S. basic questions to show "his competency, that he understands the questions asked and that he's being truthful by his responses he's giving . . . ."[19]

---

[16] *Id.* at 105.

[17] *Id.* at 112 (Quinn-Brintnall, C.J., dissenting).

[18] Haner testified that she used different treatment interview protocols for children and adults, but her interview of D.S. did not address whether D.S. knew the difference between a truth and a lie or whether he would tell her the truth. Her testimony cannot remotely be considered an opinion on D.S.'s credibility.

[19] Basic questions included what D.S.'s name was, date of birth, where he lived, and where he went to school.

¶22 Rozeboom described similar child-interview training and said she would make sure a child agreed to tell her the truth during an interview. The State asked her if she was satisfied that D.S. knew the difference between a truth and a lie and if D.S. agreed to tell her the truth. She answered yes in both regards.

¶23 We continue to adhere to *Madison* and *Jones* and agree with Chief Judge Quinn-Brintnall's dissent in *Kirkman*. Richardson and Rozeboom told the jury they believed D.S. could distinguish a truth from a lie and that he had conveyed to them that he would tell the truth. This did not infringe on the jury's role as the ultimate judge of D.S.'s credibility. Even if D.S. told Richardson and Rozeboom that he would tell the truth, it was left to the jury to decide if he actually did so. Applying Chief Judge Quinn-Brintnall's reasoning, D.S.'s agreeing to tell Richardson and Rozeboom the truth was no different from his swearing an oath in open court to tell the truth. Richardson and Rozeboom did not explicitly state to the jury that they believed D.S.'s account. There is no error, and even if there were, it is not manifest and may not be raised for the first time on appeal.

¶24 We affirm.

¶25 The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. *See* RCW 2.06.040; CAR 14.

GROSSE and ELLINGTON, JJ., concur.