IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) ) ) | No. 77780-7-I |
| ERIC STEVEN SCHNEIDER, | ) ) ) | DIVISION ONE |
| Petitioner. | ) ) ) | UNPUBLISHED OPINION |
| | ) | FILED: October 14, 2019 |

LEACH, J. — Eric Schneider collaterally challenges his 2014 convictions for two counts of rape of a child in the second degree—domestic violence, one count of rape of a child in the third degree—domestic violence, and incest in the first degree. He asserts his trial counsel provided ineffective assistance because counsel did not retain a medical expert to respond to the State's medical expert's testimony. But Schneider does not establish that his counsel did not retain a medical expert. Neither does he show that counsel's decision not to present a medical expert's testimony was an unreasonable trial strategy. So he does not prove deficient performance. We deny the petition.

FACTS

In 2011, the State charged Schneider with two counts of rape of a child in the second degree—domestic violence, one count of rape of a child in the third degree—domestic violence, and incest in the first degree. A jury found him guilty

as charged. The trial court sentenced him to life in prison with a minimum term of 280 months. Schneider appealed his convictions. This court affirmed the convictions in an unpublished opinion.[1] The Washington Supreme Court denied Schneider's motion for discretionary review. He now challenges his convictions with this personal restraint petition (PRP). He asks this court to consider the record from the direct review proceedings.

We repeat the following facts from this court's opinion affirming his convictions on appeal. J.S. was born March 1, 1995, to Elizabeth. In December 2005, Elizabeth married Eric Schneider. Schneider often took care of J.S. and her two siblings while Elizabeth worked nights.

J.S. reported the following facts in police interviews and trial testimony. Schneider began sexually abusing J.S. after he married her mother. The first incident occurred while Schneider and the three children were driving at night to pick up Elizabeth. After Schneider stopped the car near the woods, he told the boys to get out and play. He then took J.S. onto his lap and attempted to penetrate her vaginally. When she told him that hurt too much, he penetrated her anally instead. Later, again in a vehicle, Schneider raped J.S. vaginally for the first time after taking her to a father-daughter dance.

---

[1] State v. Schneider, No. 71822-3-I (Wash. Ct. App. April 25, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/718223.pdf.

J.S. could recall only these incidents in detail. The "rest of the times, they just blended in." She testified that the rapes occurred once per week in the beginning and increased to three or four times per week when she was 14 and 15. Schneider and J.S. also had oral sex. Schneider penetrated J.S. using sex toys. At other times, he penetrated her with a handgun. He asked J.S. to wear her mother's lingerie and high-heeled shoes. He showed her pornography and asked her to imitate what it showed.

Schneider and J.S. often had sex in vehicles. He also took her to empty houses under construction and to motel rooms. Schneider also had sex with J.S. in her parents' bedroom and her own bedroom and, less often, in the living room.

J.S. described Schneider as being gentle with her at first but violent as she grew older. He hit her. He put a belt around her throat and held it during sex. He penetrated her with a sex toy in one orifice while he was penetrating her in another. After he raped her in the shower, he urinated on her. Once, he carved his initials on her pubis with a knife, making her bleed. When J.S. told Schneider she wanted to stop having sex, Schneider told her he would kill her if she told anyone about the abuse. Schneider also told J.S. he had been "fixed" so they did not need to use condoms. J.S. reported, accurately, that Schneider is circumcised.

J.S. stated in some interviews that Elizabeth's ex-partner molested her when she was five years old. She told Schneider about this abuse. In 2011,

Schneider took her to an appointment with a mental health counselor. During the session, she told the counselor that Schneider had not abused her. J.S. also spoke to Annetta Spicer, formerly Schneider's family law lawyer, as part of a child custody dispute between Schneider and his ex-wife, Jessica. Spicer told J.S. that Jessica's sister, A.S., had alleged Schneider abused her.

J.S. told her mother about Schneider's abuse in October 2011. He had last raped her about two weeks earlier, after he and Elizabeth had separated. The next week, J.S. reported the rapes during a sexual assault examination with Nurse Joanne Mettler who testified at trial. Schneider's counsel did not present a medical expert at trial. The trial court admitted A.S.'s testimony that Schneider raped her when she was a young girl. It found that the alleged rapes of A.S. and J.S. were "markedly similar" and ruled that the State could present evidence of the earlier rapes to show "a general plan, a design to fulfill [Schneider's] sexual compulsions." A.S. testified at length about Schneider's abuse.

## ANALYSIS

Schneider claims that his trial counsel provided ineffective assistance because counsel did not retain a medical expert or present expert medical testimony controverting Nurse Mettler's testimony. We disagree.

To receive collateral relief by a PRP, a defendant must show either an error of constitutional magnitude that caused actual prejudice or a

nonconstitutional error that resulted in a "'complete miscarriage of justice.'"[2] An ineffective assistance of counsel claim alleges a claim of constitutional magnitude. The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel to help ensure a fair trial.[3]

Claims of ineffective assistance present mixed questions of law and fact, which this court reviews de novo.[4] When this court examines an ineffective assistance claim, it strongly presumes that counsel provided effective representation.[5] To succeed on an ineffective assistance claim, the defendant must show that (1) his counsel's performance fell below an objective standard of reasonableness and (2) prejudiced him.[6] Counsel's performance is deficient if it was unreasonable under prevailing professional norms and was not sound trial strategy.[7] This court evaluates the reasonableness of counsel's performance from "'counsel's perspective at the time of the alleged error and in light of all the

---

[2] In re Pers. Restraint of Grantham, 168 Wn.2d 204, 212, 227 P.3d 285 (2010) (quoting In re Pers. Restraint of Isadore, 151 Wn.2d 294, 298, 88 P.3d 390 (2004)).

[3] See State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011); see also State v. Coristine, 177 Wn.2d 370, 375, 300 P.3d 400 (2013).

[4] In re Pers. Restraint of Fleming, 142 Wn.2d 853, 865, 16 P.3d 610 (2001).

[5] In re Pers. Restraint of Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004).

[6] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[7] Davis, 152 Wn.2d at 673.

circumstances.'"[8] To establish prejudice, a defendant must show a reasonable probability that the result of the trial would have been different without his counsel's deficient performance.[9] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[10] In a PRP proceeding, a defendant who shows ineffective assistance has necessarily met his burden to receive collateral relief.[11]

Here, the State presented the testimony of Mettler, an advanced registered nurse practitioner at the Harborview Center for Sexual Assault and Traumatic Stress. Mettler testified about her credentials, including a bachelor's degree in nursing, a master's degree in maternal child health, and a post-certificate as a pediatric nurse. She also testified about her extensive experience. She had been in her current position for 15 years and performed medical evaluations of children when there are concerns of abuse. Before working at Harborview, she practiced as a nurse for 15 years in various capacities, some involving treating patients who were sexually abused. She testified that she keeps up-to-date with the medical literature relevant to evaluating and treating sexual abuse patients.

---

[8] Davis, 152 Wn.2d at 673 (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986)).

[9] Strickland, 466 U.S. at 694.

[10] Strickland, 466 U.S. at 694.

[11] In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

Mettler stated that she performed a full-body exam of J.S. on November 3, 2011. She used a magnifying tool called a colposcope to check J.S.'s genital and anal areas. Mettler concluded that J.S. had a "normal genital examination," meaning Mettler did not observe any sign of infection, acute injury, or healed injury. And she did not find any sexually transmitted diseases. She testified that because a female's genital area heals "really quickly," this result did not mean that J.S. had never had vaginal sex. She explained that the hymen, which sits at the opening to the vagina, does not "disappear[ ]" when a woman has vaginal sex. So the fact that J.S.'s hymen looked "very thick and very wavy and redundant" is not indicative of an absence of penetration. She testified that a woman could give birth to two children and have no visible evidence of scarring or tearing. Mettler explained that 98 percent of the time she finds no evidence of any kind of injury in the vaginal or anal tissues in patients who claim sexual abuse. During cross-examination, she stated that although she did not assess J.S. for "notches," a V-shape in the hymen resulting from penetration, she has seen notches in some patients.

Mettler also stated that J.S. had two small anal fissures or tears to the skin, which generally heal within 48 to 72 hours. Because J.S. told Mettler the last time she had seen Schneider was a month before her examination, Mettler

reported that the fissures were not related to any assault that may have occurred when J.S. last saw him.

Schneider contends that his trial counsel's decision not to hire or call a medical expert witness was not a legitimate trial tactic because "[a]ny reasonably competent attorney would have located a medical expert who could testify regarding these medical findings and the importance of this evidence and Nurse Mettler's testimony." We address the failure to hire an expert witness claim first.

Schneider acknowledges that generally, "the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel."[12] But Schneider emphasizes that the Washington Supreme Court has stated, "depending on the nature of the charge and the issues presented, effective assistance of counsel may require the assistance of expert witnesses to test and evaluate the evidence against a defendant."[13] And our Supreme Court has noted that in cases of child sexual abuse, "[t]he most effective types of corroboration . . . are eyewitness testimony, a confession or admissions by the accused, and medical or scientific testimony documenting abuse."[14] But this authority does not require that this court conclude an attorney's performance is deficient if he or she does not hire a

---

[12] State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995).
[13] State v. A.N.J., 168 Wn.2d 91, 112, 225 P.3d 956 (2010).
[14] State v. Swan, 114 Wn.2d 613, 622-23, 790 P.2d 610 (1990).

medical expert in a child sexual abuse case. Schneider cites no in-state authority in which a reviewing court concluded that a defendant's trial counsel provided ineffective assistance because he or she failed to retain a medical expert. Instead, he relies on four cases from other jurisdictions; two were reversed and two are factually distinguishable.

First, he cites Jackson v. Conway.[15] There, the United States District Court held, in relevant part, that Jackson's trial counsel provided ineffective assistance because his counsel failed to retain a medical expert witness to opine on the trauma observed during the victim's physical evaluation and the discrepancies of this evaluation.[16] But the United States Court of Appeals for the Second Circuit reversed, holding that Jackson's trial counsel's performance was not deficient because he was operating under the assumption that the State would not call a medical expert at trial.[17] So, counsel refrained from calling a medical expert for a valid strategic reason, to prevent the State from cross-examining a defense expert witness.[18]

Second, Schneider relies on Michael T. v. Commissioner of Correction,[19] in which the Connecticut Court of Appeals held, "[T]he petitioner is entitled to a

---

[15] 765 F.Supp.2d 192 (W.D.N.Y. 2011).
[16] Jackson, 765 F.Supp.2d at 262-68, 287.
[17] Jackson v. Conway, 763 F.3d 115, 153 (2nd Cir. 2014).
[18] Jackson, 763 F.3d at 153-54.
[19] 122 Conn. App. 416, 999 A.2d 818 (2010).

new trial because his trial counsel was ineffective in failing to present expert testimony to challenge the state's expert medical testimony that strongly linked the child's trichomonas[20] to a sexual assault." The Connecticut Supreme Court reversed, holding that defense counsel elicited the possibility of non-sexual transmission during cross-examination, so the defendant did not establish that any deficiency caused him prejudice.[21]

Third, Schneider cites a California appellate case, In re Hill,[22] in which a jury convicted Hill of 23 counts of sexual offenses. Hill had the herpes virus and the victim initially reported 100 to 200 instances of sexual contact with him.[23] After trial, Hill consulted a medical expert who stated that it was almost a statistical certainty that the victim did not have sexual intercourse with Hill 100 to 200 times because she was not infected with the herpes virus.[24] The California Court of Appeals held that Hill's trial counsel provided ineffective assistance by failing to present expert testimony about the lack of physical findings and infection after that many contacts.[25] The court additionally reasoned that a

---

[20] "Trichomonas is a parasitic protozoa that can infect the urinary tract or prostate of males and the vagina or urinary tract of females." Michael T., 122 Conn. App. at 419 n.5.

[21] Michael T. v. Comm'r of Corr., 307 Conn. 84, 102-03, 52 A.3d 655 (2012).

[22] 198 Cal. App. 4th 1008, 1011, 129 Cal.Rptr.3d 856 (2011).

[23] Hill, 198 Cal. App. 4th at 1015, 1029.

[24] Hill, 198 Cal. App. 4th at 1029.

[25] Hill, 198 Cal. App. 4th at 1029.

defense expert would have supported the victim's testimony at trial, in which she recanted her previous allegations of sexual assault.[26]

Last, he cites <u>Gersten v. Senkowski</u>.[27] There, the State presented uncontroverted expert testimony describing colposcopic evidence as "highly suggestive of penetrating trauma to the hymen."[28] The United States Court of Appeals for the Second Circuit affirmed the trial court's grant of Gersten's petition for a writ of habeas corpus based on ineffective assistance of counsel. It reasoned that because Gersten's trial counsel failed to call as a witness or even consult any medical expert on child sexual abuse, "[c]ounsel essentially conceded that the physical evidence was indicative of sexual penetration."[29]

<u>Jackson</u> and <u>Michael T.</u> were reversed on the relevant issue, so they are not persuasive. In <u>Hill</u>, the victim recanted, and there was an exculpatory fact related to the medical evidence that Hill's trial counsel did not pursue. That is not this case. And in <u>Gersten</u> the State's medical expert presented physical evidence of abuse and Gersten's trial counsel did not solicit medical expert consultation or testimony to controvert it. Here, Mettler testified that she found no physical evidence of abuse. These cases do not support that Schneider's counsel provided deficient performance by not retaining a medical expert witness.

---

[26] <u>Hill</u>, 198 Cal. App. 4th at 1018, 1029.
[27] 426 F.3d 588 (2nd Cir. 2005).
[28] <u>Gersten</u>, 426 F.3d at 595.
[29] <u>Gersten</u>, 426 F.3d at 607-08.

Additionally, Schneider's PRP counsel conceded at oral argument that he could not establish that Schneider's trial counsel did not consult with a medical expert. Mark Vovos, an attorney who Schneider retained to provide an expert opinion about the performance of Schneider's trial counsel, stated only that he reviewed the materials PRP counsel provided; he did not state that he reviewed Schneider's trial counsel's file despite PRP counsel's representation during oral argument that PRP counsel had this file.

Schneider also fails to show that his counsel's decision about presenting a medical expert was not a legitimate trial tactic. After his trial, Schneider retained new counsel who consulted with Dr. Stephen R. Guertin, a physician of 35 years. Guertin's qualifications include his many duties at Sparrow Hospital in Lansing, Michigan where he is Medical Director of the Sparrow Children's Center, Director of the Pediatric Intensive Care Unit, and a physician member of the Child Safety Program. In addition, he is an Associate Professor of Pediatrics at Michigan State University's College of Human Medicine. He does clinical work in the areas of general pediatrics, pediatric critical care, and child abuse. After reviewing J.S.'s and Mettler's testimony and Mettler's medical report, he prepared a report detailing the current research about "remote examinations of post-pubertal girls claiming that intercourse occurred many times during prepubertal puberty, and postpubertal period" and his opinions.

His report summarized a number of studies related to postpubertal vaginal intercourse, bleeding, and prepubertal vaginal penetration by an erect penis. He stated that two prominent studies from 1996 and 2004 established that the most common residual injuries of the hymen after intercourse in teens are "transections and deep notches of the posterior (lower) portion of the hymen at 3:00 and 9:00. . . . [A]ccording to our current (2015) guidelines[, these indicators] can be used to support a history of penetrative sexual abuse." Because Mettler did not examine J.S. for notches, she made no finding about whether J.S. had notches. Schneider's trial counsel cross-examined Mettler about her failure to assess J.S. for notches without presenting expert witness testimony on the issue. Counsel asked Mettler a number of questions about notches and she reiterated that she did not assess for notches. On the State's redirect examination, the prosecutor asked Mettler why she did not assess J.S. for notches; Mettler replied, "In general, I don't assess for notches in adolescents, or actually even in children where there's a report or an indication that there's been prior penetration."

Guertin also discussed two studies, conducted in 2009 and 2004, which did not include all notches as physical evidence of penetration; he opined that these studies did not include the injuries most commonly sustained during intercourse in adolescents or use the proper definition of deep notch and or

-13-

transections. In the 2009 study, only 13 percent of 410 teens who had experienced penetrative abuse showed physical evidence of penetration. And in the 2004 study, only 18 percent of 28 pregnant teens showed abnormal physical indicators. Based on these studies, only 13 to 18 percent of teens alleged sexual abuse would be expected to have physical findings. Guertin's report also discussed two studies concluding that an abnormal examination was approximately 2.5 times more likely when a report of vaginal bleeding was part of the allegation. One was the 2009 study in which a positive exam was 2.47 times greater with a history of bleeding, which means approximately 32 percent of teens showed physical evidence. These studies are not sufficiently conclusive to show that Schneider's trial counsel performed deficiently by not introducing them through expert testimony. Indeed, some of them strongly corroborate Nurse Mettler's opinion about a "normal exam." This court cannot fault counsel for not calling an expert who would be forced to admit this on cross-examination.

Guertin additionally discussed anal injury, stating that because anal injuries heal quickly, "anal injury may be expected up to 63% of the time when a sodomy victim is examined within 3 days of the last assault, [and] by 5 weeks later a normal examination would be predictable." Guertin opined that an anal examination done as remotely as J.S.'s "cannot be used to imply that sodomy had not occurred." This is consistent with Mettler's testimony that J.S.'s anal

fissures were unrelated to any sexual abuse that occurred when J.S. last saw Schneider. Additional testimony about this issue would have been cumulative.

Last, Guertin's report focused on the effects of vaginal-penile penetration on prepubertal girls. Guertin stated studies show that penile penetration in the vagina of an eight-or nine-year-old girl would be expected to cause a complete tear or transection of the hymen because the hymen of a prepubertal girl is not easily stretched. Studies show that although prepubertal transections can heal to the point of appearing normal, most prepubertal penetration causes tears or notches in the hymen that persist.

First, although Schneider asserts "it bears noting that the State did solicit lengthy testimony by [J.S.] about rapes which occurred apparently prior to the age range of over 12 for those charges actually prosecuted," he acknowledges that a discussion about prepubertal penetration "is rendered to some degree irrelevant by the State's charging decisions in this case." Second, Guertin stated that the penile penetration J.S. experienced started when she was "only 8-9 years old and likely was prepubertal at that time." But J.S. testified that Schneider started having sex with her after he and her mother were married, which her mother testified occurred in 2005 when J.S. was 10 years old. And J.S. testified that Schneider initially penetrated her only anally because it hurt her for him to do so vaginally. At 10 years old, J.S. was no longer in the 8-to-9 year

old prepubertal range that Guertin's cited studies discussed. Third, the studies support that a prepubertal girl who experiences transections caused by vaginal-penile penetration can have a normal examination later on. Finally, as stated above, Mettler did not assess J.S. for notches, so any study relying on notch findings would not provide a basis for effective cross-examination or argument to the jury. For these reasons, Guertin's discussion about the effects of penetration in prepubertal girls is not helpful to Schneider.

Based on these studies, Guertin concluded one of four alternative scenarios occurred. Three of these alternatives rely on J.S. experiencing prepubertal intercourse, which, as discussed above, is inconsistent with J.S.'s testimony. The fourth alternative is "Nothing happened to [J.S.'s] genital and anal areas [because J.S.] is fabricating a story. Parental influence, a desire to share victimhood or to be one, persistent questioning[,] . . . a vendetta or exposure to sexual activity or pornography might help explain the story." But experts may not state an opinion about a victim's credibility because such testimony invades the province of the jury.[30] So any defense expert would not have been permitted to testify about whether he or she believed J.S. was fabricating her testimony.

---

[30] State v. King, 131 Wn. App. 789, 797, 130 P.3d 376 (2006).

We conclude that it was within the realm of sound trial strategy for Schneider's trial counsel not to call a medical expert to testify about the significance Nurse Mettler's exam or challenge her opinion about the absence of physical evidence of trauma to J.S. First, Mettler reported that she did not observe any evidence of trauma, meaning the medical evidence did not corroborate J.S.'s claims of abuse. Mettler's testimony that she commonly finds no evidence of injury in the vaginal or anal tissues in patients who have been sexually abused did provide medical evidence supporting J.S.'s claim that Schneider abused her. Second, the studies that Guertin cites measuring physical evidence of abuse other than notches reported a low incidence of physical evidence among victims of penetrative abuse. These studies do not help Schneider. And cross-examination of an expert like Guertin would have emphasized studies like these. Also, it would have involved questions about the specific nature of the rapes J.S. described. Schneider's trial counsel reasonably could have chosen to avoid these questions to prevent generating sympathy for J.S. and the reiteration of the gruesome details of the rapes.[31]

Schneider does not establish through Guertin's report that his trial counsel's decision not to call a medical expert was not a legitimate trial tactic.

---

[31] See Harrington v. Richter, 562 U.S. 86, 108, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Because he does not prove deficient performance, we need not examine prejudice.[32]   Schneider does not overcome the strong presumption that his counsel provided effective representation.

We deny the petition.

_Leach, J._

WE CONCUR:

_Andrus, J._                    _Mann, ACJ_

---

[32] State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996) (stating if a reviewing court concludes that a defendant fails to establish either prong of ineffective assistance of counsel, it need not inquire further).