138 P.3d 1081 (2006)
STATE of Washington, Respondent,
v.
Richard WARREN, Appellant.
No. 54032-7-I.
Court of Appeals of Washington, Division 1.
July 10, 2006.
*1083 Dennis John McCurdy, King County Prosecutor's Office, Seattle, WA, for Respondent.
Ric Warren, Pro Se.
Elaine L. Winters, Washington Appellate Project, Seattle, WA, for Appellant.
SCHINDLER, A.C.J.
¶ 1 In the first trial, a jury convicted Richard Warren on one count of child molestation in the first degree of his eight-year-old stepdaughter, S.S. In a second trial, a jury convicted Warren on three counts of rape of his fourteen-year-old stepdaughter, N.S. Warren challenges his conviction in the first trial claiming the child interview specialist and police detective violated his constitutional rights by improperly vouching for S.S.'s credibility; the trial court abused its discretion in admitting evidence; prosecutorial misconduct denied him a fair trial; and cumulative error. Warren challenges his conviction in the second trial based on evidentiary rulings, prosecutorial misconduct, and cumulative error. Warren also contends the condition of his sentence prohibiting contact with Lisa Warren, the mother of S.S., N.S., and his child is not crime-related and violates his constitutional rights.
¶ 2 Because the child interview specialist and the police detective did not explicitly say they believed S.S., any error in admitting their testimony is not manifest constitutional error that can be raised for the first time on appeal. We also conclude the trial court's evidentiary rulings were not an abuse of discretion; there is not a substantial likelihood the outcome of the two trials was affected *1084 by improper arguments of the prosecutor; and Warren was not denied his constitutional right to a fair trial. In addition, the trial court's decision to prohibit contact with Lisa Warren as a condition of his sentence is crime-related and is not an unconstitutional restriction. We affirm Warren's conviction for child molestation of S.S. and three counts of second-degree rape of N.S.

FACTS
¶ 3 Richard Warren and Lisa Warren married in 2001 and lived together with Lisa's two daughters from a prior marriage S.S. and N.S. In March 2002, the family was living in Bellevue and Lisa was approximately seven months pregnant with Warren's child.[1] On March 24, Lisa and Warren had an argument which became physical. Warren was charged with a domestic violence offense. He pleaded guilty and was sentenced to serve time in the King County Jail.
¶ 4 On the morning of June 11, 2002, nine-year-old S.S. told her teacher she was upset because her stepfather was coming home from jail. When S.S. met with the school counselor, she said Warren did "disgusting things" to her. When asked what she meant, S.S. said Warren made her wear short skirts without underwear, touched her between her legs, showed her pornographic video covers, and talked to her about sex. The counselor reported the disclosures to the police and Child Protective Services (CPS).
¶ 5 Two Bellevue police detectives came to S.S.'s elementary school to talk to her. S.S. again described how Warren touched her inappropriately on several different occasions and exposed her to sexual material. After the interview, the detectives met with S.S.'s 14-year-old sister, N.S., at her school. N.S. denied Warren had any inappropriate sexual contact with her. CPS placed S.S. and N.S. in protective custody.
¶ 6 When S.S. was later interviewed by Nicole Farrell, a forensic child interview specialist for the prosecutor's office, S.S. repeated the disclosures she made to the school counselor and the detectives. The State charged Warren with one count of rape in the first degree and one count of child molestation in the first degree of S.S.
¶ 7 Lisa Warren did not initially cooperate with the police. After Warren was arrested, S.S. and N.S. returned home to live with their mother. In August 2003, Lisa and her daughters did not appear for the scheduled trial date. The police located Lisa and the girls in Tacoma at Lisa's sister's house. Lisa was arrested on a material witness warrant and S.S. and N.S. were again placed in protective custody.
¶ 8 The next day, S.S. and N.S. went to the prosecutor's office to prepare for the trial. S.S. was upset and wanted to see her mother. S.S. did not want to talk about the trial, but told the detectives and the prosecutor that everything she told the counselor was true. When Detective Ryland and the prosecutor met separately with N.S., she told them she only wanted to talk about what happened to S.S. N.S. said she was concerned about having to swear on the Bible when she testified because she did not want to lie. N.S. did not want the prosecutor to ask her at trial if Warren did anything to her. N.S. then disclosed that she had been sexually abused by Warren.
¶ 9 N.S. said Warren engaged in vaginal, anal, and oral intercourse with her on numerous occasions. Warren told her he was "teaching" her and he made her watch pornographic videos to show her how to perform sexual acts properly. Sometimes when Warren had intercourse with her, he covered her eyes with a bandana and sometimes he put a pink ball in her mouth. N.S. also said Warren told her that if she complied, he would not do the same things with S.S. N.S. was afraid to tell her mother, but told the detectives she "didn't want to lie anymore." After talking to N.S., the police detectives visited Lisa in jail and told her about N.S.'s disclosures. After learning about the disclosures, Lisa cooperated with the police and the prosecutor.
¶ 10 The court allowed the State to amend the information to add three additional counts of second-degree rape of N.S. The charges against Warren for one count of rape *1085 and child molestation of S.S. and for three counts of second-degree rape of N.S. were tried together.
¶ 11 The defense theory was that S.S. and N.S. were not truthful or credible. Warren argued that S.S. alleged sexual abuse because she did not want Warren to return home after the domestic violence incident with her mother. Because S.S. suffered frequent vaginal irritations, Warren claimed he only touched her genital area for benign medical reasons. Warren argued N.S. was not credible because when she was initially asked by the detectives, N.S. unequivocally denied Warren sexually abused her and only "remembered" the abuse later. Warren claimed N.S. had a motive to fabricate because she thought lying might result in her mother being released from jail and prevent Warren from returning home. Warren did not testify in the first trial. Following a six-day trial, the jury found Warren guilty on one count of child molestation of S.S. The jury was unable to reach a verdict on the charge of rape of S.S. or on the three counts of second-degree rape of N.S.
¶ 12 A second trial on the three counts of second-degree rape of N.S. began in November 2003.[2] Warren testified in the second trial. Elizabeth Loftus, a research psychologist and expert on memory also testified on Warren's behalf. After a five-day trial, the jury found Warren guilty on all three counts of second-degree rape of N.S. The court imposed a 280-month standard range sentence.[3] As a condition of Warren's sentence, the court ordered no contact with Lisa Warren for life. Warren appeals.

ANALYSIS

S.S. TRIAL

Opinion Testimony
¶ 13 For the first time on appeal, Warren contends that the testimony of child interview specialist Nicole Farrell and Bellevue police detective Jennifer Rylands improperly vouched for S.S.'s credibility and violated his constitutional rights. Even though Warren did not object at trial, he argues admission of the testimony was a "manifest error affecting a constitutional right." No witness may state an opinion about a victim's credibility because such testimony "invades the province of the jury to weigh the evidence and decide the credibility of the witness." State v. Jones, 71 Wash. App. 798, 812, 863 P.2d 85 (1993) (citing State v. Alexander, 64 Wash.App. 147, 154, 822 P.2d 1250 (1992)); State v. Madison, 53 Wash.App. 754, 760, 770 P.2d 662 (1989).
¶ 14 Child interview specialist Nicole Farrell testified that she interviewed S.S. on June 13, 2002. Before testifying about S.S.'s disclosures, Farrell described the interview process. Farrell told the jury she conducts a "forensic" or "neutral" interview as distinguished from an interview for therapeutic purposes. Farrell also testified that the protocol requires discussing the importance of telling the truth with the child. When interviewing a very young child, Farrell said she often conducts a "competency assessment" that includes an in-depth discussion of truthfulness. Farrell testified she did not do a competency assessment when she interviewed S.S. because of her age and developmental stage. But Farrell told S.S. that as they talked, it is "important to only talk about the truth" and asked S.S. if she could "promise to only talk about the truth today." Farrell testified that S.S. nodded her head affirmatively. Farrell then testified about the information S.S. disclosed during the interview.
¶ 15 Both the State and the defense asked Farrell questions to clarify if her role in the interview was to determine whether a child is telling the truth. The prosecutor asked Farrell if she forms "an opinion about whether or not you believe the child or believe that something really happened" when interviewing *1086 a child. In response, Farrell said that type of assessment was "outside the scope" of her role. During cross examination, the defense suggested that it was not Farrell's role to determine what actually happened, but "only to see what the child said happened." While Farrell said that one of her objectives was to "set up a context in which the child has demonstrated a knowledge of the difference between telling the truth and fabricating, and to get an agreement from the child that they will in fact tell the truth," she agreed that it was not her role to determine whether the child was being truthful.
¶ 16 Detective Rylands also testified about her interview of S.S. at her school following the disclosures to the school counselor. Detective Rylands said that after introducing herself to S.S., she explained the "rules" of the interview. She told S.S. to let her know if she didn't understand a question and "always tell the truth." Detective Rylands said she then asked S.S. to describe the meaning of the truth and a lie, and asked her which one was better. S.S. told Detective Rylands the truth is "[w]hen someone is telling what really happened and it happened to them" and "[a] lie is when it really didn't happen." S.S. also responded that "truth is better, even when it hurts someone." Rylands then testified about S.S.'s disclosures.
¶ 17 Warren relies on State v. Kirkman, 126 Wash.App. 97, 107 P.3d 133, rev. granted, 155 Wash.2d 1014, 124 P.3d 304 (2005), to argue admission of Farrell's and Detective Ryland's testimony was manifest constitutional error. In Kirkman, Division Two held that a police detective's testimony about evaluating a child's competency to tell the truth was "manifest' `constitutional error that will be reviewed for the first time on appeal'" and reversed the defendant's conviction for first-degree rape of an eight-year-old child. Kirkman, 126 Wash.App. at 107, 107 P.3d 133. The police detective in Kirkman testified that he gave a "competency" test during an interview with the alleged child victim to determine if she could distinguish between the truth and a lie. Id. at 101, 107 P.3d 133. When asked if the child understood the importance of telling the truth and distinguishing between the truth and a lie, the detective testified the child could and that she promised to tell the truth. The court held that although the detective did not express an opinion on the victim's credibility, "he told the jury that he tested [the victim's] competency and her truthfulness. In essence, he told the jury that [the victim] told the truth when she related the incriminating events to him." Id. at 105, 107 P.3d 133. The court concluded the detective's testimony invaded the role of the jury to decide credibility and violated Kirkman's right to a trial by jury.[4] Because the only evidence supporting the defendant's conviction was the child's testimony and her prior statements, the court concluded the error in admitting the testimony was a "manifest" constitutional error that could be raised for the first time on appeal and the erroneous admission of the evidence was not harmless. Id. at 107, 107 P.3d 133.[5] The dissent in Kirkman argued the majority improperly considered the issue for the first time on appeal and the detective did not express an opinion on the victim's credibility or a belief in the truth of her account. Id. at 112, 107 P.3d 133, (Quinn-Brintnall, J., dissenting).
¶ 18 We disagree with the analysis in Kirkman and follow this court's recent decision in State v. King, 131 Wash.App. 789, 130 P.3d 376 (2006). In King, we followed previous decisions holding that when a witness does not expressly state his or her belief of the victim's account, the testimony does not constitute manifest constitutional error. King, 131 Wash.App. at 800, 130 P.3d 376. In King, two witnesses testified that they tested the victim's competency to determine his ability to tell the truth and that the victim *1087 agreed to tell the truth in his interview. Relying on State v. Madison, 53 Wash.App. 754, 770 P.2d 662 (1989), and State v. Jones, 71 Wash.App. 798, 863 P.2d 85 (1993), we held this testimony did not infringe on the jury's role to determine credibility because the witnesses did not explicitly state they believed the victim. Id.
¶ 19 In Madison, an expert witness testified without objection, that a young child's conduct was "typical of a sex abuse victim.'" Madison, 53 Wash.App. at 760, 770 P.2d 662. The court rejected the argument that the testimony amounted to a statement of belief in the victim's story and, consequently, an opinion on the defendant's guilt. Id. After acknowledging that certain statements would have been properly excluded if challenged at trial, the court indicated its general reluctance to recognize the admission of testimony without objection as manifest constitutional error.
Appellate courts are and should be reluctant to conclude that questioning, to which no objection was made at trial, gives rise to `manifest constitutional error' reviewable for the first time on appeal. The failure to object deprives the trial court of an opportunity to prevent or cure the error. The decision not to object may be a sound one on tactical grounds by competent counsel, yet if raised successfully for the first time on appeal, may require a retrial with all the attendant unfortunate consequences. Even worse, and we explicitly are not referring to counsel in this case, it may permit defense counsel to deliberately let error be created in the record, reasoning that while the harm at trial may not be too serious, the error may be very useful on appeal.
¶ 20 Madison, 53 Wash.App. at 762-63, 770 P.2d 662.
¶ 21 In Jones, the child told the CPS caseworker that Jones sexually abused her. Jones did not object to the testimony that the child told the caseworker, "[b]elieve me, believe me, I am telling you that this happened,'" or the caseworker's reply, "I believe you.'" Jones, 71 Wash.App. at 804, 863 P.2d 85. The court held that in context, the caseworker's testimony was an effort to reassure the child and was not a statement that the caseworker believed the child. Citing Madison, we also held that because there was no objection and the caseworker did not expressly state that she believed the child, Jones could not raise the issue for the first time on appeal. Jones, 71 Wash.App. at 812, 863 P.2d 85.
¶ 22 If a defendant does not object at trial, the defendant cannot challenge the testimony for the first time on appeal. RAP 2.5(a). The exception under RAP 2.5(a) for manifest error affecting a constitutional right is a narrow one. State v. Scott, 110 Wash.2d 682, 687, 757 P.2d 492 (1988). Requiring defendants to meet a high threshold to raise issues for the first time on appeal ensures that parties give the trial court an opportunity to obviate error and prevent prejudice to the defendant. City of Seattle v. Heatley, 70 Wash.App. 573, 584-85, 854 P.2d 658 (1993). The exception "is not intended to swallow the rule, so that all asserted constitutional errors may be raised for the first time on appeal. Indeed, criminal law has become so largely constitutionalized that any error can easily be phrased in constitutional terms." State v. Trout, 125 Wash.App. 313, 317, 103 P.3d 1278, rev. denied, 155 Wash.2d 1004, 122 P.3d 185 (2005).
¶ 23 Under RAP 2.5(a)(3), a defendant must also show how an alleged constitutional error actually affected his rights at trial. McFarland, 127 Wash.2d 322, 334, 899 P.2d 1251 (1995). It is this showing of actual prejudice that makes the error "manifest.'" McFarland, 127 Wash.2d at 333, 899 P.2d 1251. A "manifest" error is "unmistakable, evident or indisputable, as distinct from obscure, hidden or concealed." State v. Lynn, 67 Wash.App. 339, 345, 835 P.2d 251 (1992). "An appellant who claims manifest constitutional error must show that the outcome likely would have been different, but for the error." State v. Jones, 117 Wash.App. 221, 232, 70 P.3d 171 (2003).
¶ 24 Here as in King, we conclude the testimony of Farrell and Detective Rylands was not manifest constitutional error that impermissibly invades the province of the fact finder and because Warren did not object *1088 below, he may not challenge the testimony for the first time on appeal. We also conclude that the testimony of Farrell and Detective Rylands was not the same as the detective's testimony in Kirkman. Unlike the detective in Kirkman who told the jury that he tested the victim's "competency" and her "ability to tell the truth," neither Farrell nor Detective Rylands testified that they evaluated S.S.'s "competency;" that they made a determination of S.S.'s ability to tell the truth; or that they believed S.S. was telling the truth. Farrell explicitly told the jury that she did not test S.S.'s competency or assess her truthfulness and it was outside the scope of her role to do so. And Detective Rylands did not explain any purpose for her questions about the difference between the truth and a lie beyond stating that it was a part of the "rules" for the interview. But even if the testimony in this case were indistinguishable from that in Kirkman, as in King, we conclude the admission of the testimony without objection is not manifest constitutional error that Warren can challenge for the first time on appeal.

Evidentiary Rulings
¶ 25 Warren challenges (1) the admission of Detective Rylands' testimony that Lisa appeared to be more protective of him than concerned about S.S.'s allegations, and (2) the admission of the evidence that Warren owned a "penis pump."
¶ 26 The admissibility of evidence is within the discretion of the trial court, and a reviewing court will reverse only when the trial court abuses its discretion. State v. Atsbeha, 142 Wash.2d 904, 913-14, 16 P.3d 626 (2001). An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. Id.
¶ 27 Detective Rylands testified that she spoke to Lisa Warren on the telephone after S.S. disclosed Warren sexually abused her. Detective Rylands told Lisa her daughters were in protective custody and asked Lisa to come to the police station. Lisa agreed, but then did not show up. The next day, Detective Rylands went to Lisa's residence to arrest Warren. When asked to describe Lisa's demeanor, Detective Rylands said Lisa seemed "not so concerned" about her daughters and "more protective" of her husband. The trial court overruled Warren's objections based on "speculation" and "hearsay." The court ruled that Detective Ryland's testimony was admissible opinion testimony under ER 701 because it was "rationally based on the perception of the witness." We agree.
¶ 28 Detective Rylands could properly testify under ER 701 based on her observations of Lisa Warren. ER 701 allows a witness to express an opinion that is "rationally based on the perception of the witness." In addition, the evidence was relevant to rebut the defense theory that S.S. fabricated the allegations against Warren because she did not want him to return home. Testimony about Lisa's reaction offered an alternative explanation about the timing of the disclosures and why S.S. did not tell her mother about the abuse.
¶ 29 Warren also claims the trial court abused its discretion in admitting evidence that he owned a "penis pump" because the evidence was irrelevant and prejudicial. Detective Rylands testified that S.S. talked about a "penis pump" when describing how Warren showed her pornographic video covers and explained sexual intercourse. S.S. told the detectives what a penis pump looked like and about its use.
¶ 30 S.S. did not testify about the penis pump during direct examination. On cross examination S.S. said she saw the penis pump in Warren's briefcase, but Warren did not show it to her or show her how it worked. Warren contends that because S.S. did not testify that Warren showed the device to her or talk to her about it, the evidence was not relevant and should have been excluded. Detective Rylands' testimony about what S.S. described was relevant. S.S.'s contradictory testimony on cross examination goes to the weight of the evidence, not its admissibility. See State v. Walton, 64 Wash.App. 410, 415-16, 824 P.2d 533 (1992) (it is the function of the trier of fact to weigh the persuasiveness of evidence). The trial court's decision to allow Detective Rylands to testify about what *1089 S.S. told her about the penis pump was not an abuse of discretion.

Prosecutorial Misconduct
¶ 31 During the State's closing argument, the prosecutor stated several times that reasonable doubt does not mean "give the defendant the benefit of the doubt." After sustaining objections to the prosecutor's statements, the court gave the following lengthy curative instruction:
There has been an objection to the statements made by the State as to the definition of reasonable doubt. The definition of reasonable doubt is provided in your jury instructions. I don't have the number in front of me, but I think it is the third instruction. I want you to read that instruction very carefully, particularly the last paragraph of the instruction. And the second sentence of that reads, `[i]t is such a doubt as would exist in the mind of a reasonable person after fully, fairly and carefully considering all of the evidence or lack of evidence.' Now, my statement on that is, after you have done that, after you have reviewed all of the evidence or lack of evidence, and you continue to have a reasonable doubt then you must find the defendant not guilty. And if in still having reasonable doubt that is a benefit to the defendant then in a sense you are giving the benefit of the doubt to the defendant. So I don't want you to misconstrue the language that somehow there is no benefit here. Indeed there is, because the benefit of the doubt is if you still have a doubt after having heard all of the evidence and lack of evidence, if you still have a doubt, then the benefit of that doubt goes to the defendant, and the defendant is not guilty. So we are playing with words here in a sense. The instruction is here in the package. I commend it to you for your reading. Ultimately you will determine whether at the conclusion of your deliberations you have a reasonable doubt or not.[6]
The State concedes the prosecutor's description of reasonable doubt was incorrect, but contends there was no prejudice given the court's detailed curative instruction.
¶ 32 To prevail on a claim of prosecutorial misconduct, a defendant bears the burden of showing the prosecutor's comments were improper and there is a substantial likelihood that the comments affected the jury's decision. State v. Russell, 125 Wash.2d 24, 85, 882 P.2d 747 (1994).
¶ 33 Warren asserts that the court's curative instruction was ineffective because the court's "dismissive" comment about "playing with words here" suggested the language in the reasonable doubt instruction was unimportant. In context, we disagree. In the curative instruction, the court properly described the standard of proof. The court informed the jury that contrary to the prosecutor's statements, the standard of proof in a criminal case does impart the benefit of doubt to the defendant. The court then read the definition of reasonable doubt in the jury instruction again and reiterated its importance to the jury. We conclude the trial court's curative instructions to the jury obviated any potential prejudice caused by the prosecutor's improper argument. Because of the instructions, there is no substantial likelihood that the prosecutor's remarks affected the jury's decision.[7]

N.S. TRIAL

ER 404(b) Evidence
¶ 34 The jury did not convict Warren in the first trial on the charges against him *1090 for three counts of rape of N.S. Before the second trial, the court ruled the State could introduce limited evidence about the circumstances concerning N.S.'s disclosures. The court limited the State to the evidence that S.S. alleged Warren sexually abused her; N.S. was aware of S.S.'s disclosures; charges were filed against Warren; and in the course of the investigation into S.S.'s case, N.S. told the detectives that she had been sexually abused. The court ruled that the fact that Warren was convicted of molesting S.S. was not admissible and the jury would be instructed that the case involving S.S. had been resolved and the jury should not otherwise consider it.[8]
¶ 35 The defense's theory in the second trial was that N.S. was not credible and she fabricated the allegations. The defense also claimed that N.S. alleged Warren abused her hoping that her cooperation with the State would keep her family together.
¶ 36 The testimony in the first trial established N.S. did not disclose that Warren sexually abused her when the detectives first asked her after S.S.'s disclosures. N.S. only disclosed sexual abuse when talking to the detectives in preparation for the trial concerning S.S.'s allegations of sexual abuse. In the second trial, the defense planned to call an expert witness to testify about memory to support the theory that N.S. was not credible and her explanation that she did not remember the abuse when the police first asked her was implausible.
¶ 37 Warren argues the evidence that S.S. alleged sexual abuse and that charges were filed was inadmissible under ER 404(b). Warren contends the court's decision to admit the evidence under the "res gestae" exception was erroneous. Warren concedes the charges involving S.S. were a part of the sequence of events which led N.S. to report sexual abuse, but argues the evidence was not related to the rape charges.
¶ 38 Under the res gestae exception to ER 404(b), evidence of other crimes or bad acts is admissible to complete the story or provide the immediate context for events close in time and place to the charged crime. Contrary to Warren's argument, the res gestae exception includes admission of prior bad acts when necessary to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place." Tharp, 27 Wash.App. at 204, 616 P.2d 693; see also State v. Fish, 99 Wash. App. 86, 94 992 P.2d 505 (1999).
¶ 39 Like other ER 404(b) evidence, such evidence must be relevant for a purpose other than showing propensity, and it must not be unduly prejudicial. State v. Lane, 125 Wash.2d 825, 834, 889 P.2d 929 (1995). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. A fact bearing on the credibility or probative value of other evidence is relevant. State v. Rice, 48 Wash.App. 7, 12, 737 P.2d 726 (1987). The trial court must conduct the required balancing of probative value versus prejudicial effect before admitting evidence of other bad acts. State v. Trickler, 106 Wash.App. 727, 732, 25 P.3d 445 (2001).
¶ 40 In both trials, Warren vigorously challenged N.S.'s credibility. The facts about N.S.'s initial denial and her disclosures of sexual abuse after her mother was arrested, was central to the defense case in the second trial. The court concluded that the probative value of the evidence "exceed[ed] its prejudicial impact" and took into consideration the fact that the charges were tried together in the first trial and the jury did not convict Warren on any charges involving N.S. Given the defense theory at trial and the necessity of providing the jury with evidence about the timing and context for N.S.'s disclosures, we conclude the trial court did not abuse its discretion in ruling that limited evidence concerning the circumstances of N.S.'s disclosures was admissible under the res gestae exception to ER 404(b).[9]

*1091 Admission of Conviction for Molesting S.S.

¶ 41 After Warren testified, the court revisited its decision excluding Warren's conviction for child molestation of S.S. The court ruled that Warren's testimony opened the door to admission of his conviction.[10] Warren argues that because he merely denied inappropriately touching N.S. and did not make an assertion as to his own good character, the trial court's ruling was an abuse of discretion.
¶ 42 During his testimony in the second trial, Warren described his role as a caretaker for S.S. and N.S. Warren explained that he and Lisa had major differences in their approach to childrearing and suggested that because he had grown up in a two-parent family, he was much stricter and had higher expectations of the girls. Warren also described a time when N.S. developed a skin condition that required applying lotion to her body and how he helped N.S.
Now, there is areas I wouldn't do because of, you know, being like she is a girl. But arms and back, those were areas that she couldn't reach that that was all right between me and my wife for her to have those  for me to help her there.
The court concluded that Warren's testimony did more than deny that he had sexual contact with N.S. when he put on lotion. Rather, Warren said he wasn't the type of person who would touch the sexual parts of a girl. Consequently, the court ruled that Warren could be impeached with the fact that he had been convicted of child molestation.
¶ 43 While ER 404(a) prohibits evidence of a person's character to prove "conformity," the rule provides an exception when the accused offers evidence of his character. State v. Avendano-Lopez, 79 Wash. App. 706, 715, 904 P.2d 324 (1995); ER 404(a)(1). "The long-standing rule in this state is that a criminal defendant who places his character in issue by testifying as to his own past good behavior, may be cross-examined as to specific acts of misconduct unrelated to the crime charged." State v. Brush, 32 Wash.App. 445, 448, 648 P.2d 897 (1982).
¶ 44 The determination that a party has opened the door is reviewed for abuse of discretion. State v. Bennett, 42 Wash.App. 125, 127, 708 P.2d 1232 (1985). The trial court has discretion to admit evidence that might otherwise be inadmissible if the defendant opens the door to the evidence.
¶ 45 The trial court's decision that Warren's testimony was an affirmative assertion of a character trait that allowed the State to impeach Warren with his prior conviction was not an abuse of discretion. As the trial court concluded, the only reasonable interpretation of Warren's testimony was that he was not the type of person who would touch N.S. sexually.

Exclusion of Evidence
¶ 46 Warren claims the trial court abused its discretion in excluding evidence in support of his defense. Specifically, the court excluded evidence that Warren suffered a heart attack in October 2001 and S.S.'s statement that she regretted telling anyone about the sexual abuse.
¶ 47 During opening statements, the defense told the jury that Warren suffered a heart attack in October 2001 and spent several months recovering. Outside the presence of the jury, the State objected to the introduction of evidence about Warren's heart attack. The State argued that if Warren introduced testimony about his heart attack, the molestation conviction should be admitted. The court ruled that if the defense was going to argue that because of the heart attack, Warren was not physically capable of sexual acts "during a period of time *1092 during which he has already been convicted of other acts that would open the door." The defense did not challenge the court's ruling and did not seek to introduce evidence about Warren's heart attack during trial.
¶ 48 In opening statement, Warren's attorney also told the jury that after Lisa was arrested, S.S. and N.S. went to the prosecutor's office to discuss a hearing in S.S.'s case. Warren's attorney said that before S.S. talked to the prosecutor or the detectives, N.S. heard S.S. say she "shouldn't have said anything." According to the defense theory, this remark influenced N.S. to tell the detectives she had been abused because she thought S.S. might not continue cooperating with the State and her family would not be reunited.
¶ 49 After the opening statements, Warren's attorney said the defense only wanted to present S.S.'s statement to argue that N.S. believed that S.S. might stop cooperating with the prosecutor. The court ruled that the inference that S.S. made up the charges was inescapable and if the defense wanted to present testimony about S.S.'s statement, the State was entitled to present evidence pertaining to S.S.'s credibility and the fact that Warren was convicted of molesting her. Warren did not introduce evidence about S.S.'s statement during the trial.
¶ 50 The trial court's evidentiary rulings were not an abuse of discretion and because of the strategic decision of the defense to not present evidence about Warren's heart attack or S.S.'s remark, any claimed error was not preserved. See State v. Mezquia, 129 Wash.App. 118, 131-132, 118 P.3d 378, rev. pending, 2006 Wash.App. Lexis 477 (2006).

Admission of Rap Lyrics and Officers' Reaction to N.S.'s Disclosures
¶ 51 Although rap lyrics written by Warren after his arrest were admitted in the first trial, the State did not seek to admit them in the second trial. But after Warren's direct examination, the court ruled that because Warren portrayed himself as someone who was a good caretaker of N.S. and as someone who tried to boost her self-esteem, the State could impeach Warren with the derogatory terms he used in the rap lyrics. The State then asked Warren on cross examination about his references in the lyrics to N.S. as "`stretch'" and "`mouseola-queen freakiness.'" Over defense objection, the prosecutor also asked Warren about other parts of the lyrics including a line which described watching "`Miss Exhibition in the Federal Way bathroom, rubbing your kitty real slow'" looking "`sexy and sweet'" and also a line describing N.S. as "`wanting some climactic sludge-love.'"[11]
¶ 52 Warren argues that the rap lyrics were inadmissible because they were irrelevant. He claims the lyrics were not probative of his feelings towards N.S. during the time period of the alleged crimes because they were written after his arrest. But the jury could certainly draw an inference that the lyrics reflect the way Warren felt about N.S. when they lived together and Warren was free to argue otherwise.
¶ 53 Warren also claims that the State misused the lyrics in the second trial by suggesting that "Miss Exhibition" was N.S. whereas in the first trial, the State argued that reference described inappropriate contact with S.S. While Lisa testified in the first trial that the "Miss Exhibition" referred to S.S., Lisa did not testify in the second trial, and the reference was not definitive. The court did not abuse its discretion in allowing the State to use the rap lyrics to impeach Warren's testimony.
¶ 54 Warren also argues the court abused its discretion in admitting the testimony of the detectives who said they were surprised when N.S. told them that Warren sexually abused her. Detective Rylands and Detective Faith testified that when they talked to N.S. in preparation for a hearing in S.S.'s case, they did not ask N.S. if Warren abused her and were surprised when she reported sexual abuse. Warren claims the detectives' state of mind was not relevant and was inadmissible. One of Warren's theories at trial was that N.S.'s allegations were the product of suggestion and the details came from talking to her mother and from interviews with *1093 the detectives. The context of the disclosures and the fact that N.S.'s disclosures were not in response to questioning was relevant to rebut Warren's theory and the trial court did not abuse its discretion in admitting the testimony.

Prosecutorial Misconduct
¶ 55 Warren contends that the prosecutor engaged in misconduct in three instances in closing argument. First, while discussing N.S.'s testimony, the prosecutor said certain details recounted by N.S. were a "badge of truth" and had "the ring of truth." The prosecutor then argued that N.S.'s testimony was credible based on the specific details she recounted. Warren claims the prosecutor improperly vouched for N.S.'s credibility.
¶ 56 It is improper for a prosecutor to vouch for the credibility of a witness. State v. Horton, 116 Wash.App. 909, 921, 68 P.3d 1145 (2003). However, an argument does not constitute vouching unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion as to the witness's credibility. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995). A prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on the credibility of the witnesses based on the evidence. State v. Stenson, 132 Wash.2d 668, 727, 940 P.2d 1239 (1997).
¶ 57 Here, the prosecutor argued that N.S.'s testimony was credible based on specific details she testified to at trial. Because the prosecutor's argument was based on the evidence presented at trial, it was not misconduct.
¶ 58 The State concedes that the two other arguments Warren challenges were improper. First, in rebuttal the prosecutor talked about defense counsel's mischaracterization of the evidence:
In this case, as defense counsel argued  I made notes about that number of mischaracterizations as an example of what people have to go through in a criminal justice system when they deal with defense attorneys.
Second, in discussing N.S.'s disclosure, the prosecutor made general assertions about how abused children "carefully assess who they will disclose to and how they will do it" and about the "phenomenon of delayed disclosure" being not "uncommon." Warren did not object to either of these arguments.
¶ 59 We agree these arguments were improper and accept the State's concession. The prosecutor's derogatory comment about defense attorneys was inappropriate and there was no evidence at trial about child sexual abuse victims in general or about how and why they disclose abuse. Nevertheless, Warren cannot establish "a substantial likelihood the instances of misconduct affected the jury's verdict." Pirtle, 127 Wash.2d 628, 672, 904 P.2d 245 (1995).
¶ 60 We review a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. State v. Dhaliwal, 150 Wash.2d 559, 578, 79 P.3d 432 (2003). A defendant who fails to object to an improper remark waives the right to assert prosecutorial misconduct unless the remark was so "flagrant and ill intentioned that it causes an enduring and resulting prejudice" that an admonition could not have neutralized. Russell, 125 Wash.2d at 86, 882 P.2d 747.
¶ 61 The derogatory remark about defense attorneys in rebuttal was an isolated comment. And the general statements about disclosure of sexual abuse are largely a matter of common knowledge and were not particularly relevant. We conclude Warren cannot establish prejudice that could not have been addressed by a curative instruction and there is no substantial likelihood the improper arguments affected the verdict.

Cumulative Error
¶ 62 Warren contends cumulative error denied him a fair trial. The cumulative error doctrine applies when several trial errors occur which standing alone, may not be sufficient to justify reversal, but when combined, deny a defendant a fair trial. State v. Greiff, 141 Wash.2d 910, 929, 10 P.3d 390 (2000). *1094 Because there were no errors in either trial, the cumulative error doctrine is inapplicable.

No-Contact Condition
¶ 63 Warren challenges the condition of his judgment and sentence that prohibits him from having contact with Lisa Warren. Warren claims the condition is not related to the circumstances of the crimes because Lisa Warren was not a witness to the crimes or a victim. He also argues that imposition of a condition prohibiting contact with Lisa violates his right to association under the United States and the Washington Constitutions and interferes with his fundamental right to marriage. See Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (marriage is "one of the basic civil rights of man,' fundamental to our very existence and survival.").
¶ 64 We review sentencing conditions, including crime-related prohibitions, for abuse of discretion. State v. Riley, 121 Wash.2d 22, 36-37, 846 P.2d 1365 (1993). Under RCW 9.94A.505(8), the court may "impose and enforce crime-related prohibitions" as part of a sentence. A crime-related prohibition means "an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted." RCW 9.94A.030(12). The existence of a relationship between the crime and the condition "will always be subjective, and such issues have traditionally been left to the discretion of the sentencing judge." State v. Parramore, 53 Wash.App. 527, 530, 768 P.2d 530 (1989); Riley, 121 Wash.2d at 28, 846 P.2d 1365. No causal link need be established between the condition imposed and the crime committed, so long as the condition relates to the circumstances of the crime. State v. Llamas-Villa, 67 Wash. App. 448, 456, 836 P.2d 239 (1992). Witnesses to a crime are "directly connected to the circumstances of the crime." State v. Ancira, 107 Wash.App. 650, 656, 27 P.3d 1246 (2001).
¶ 65 Crime-related prohibitions which limit fundamental rights are permissible provided the restrictions are reasonably necessary and narrowly drawn. Riley, 121 Wash.2d at 38, 846 P.2d 1365 (citing United States v. Consuelo-Gonzalez, 521 F.2d 259, 265 (9th Cir.Cal.1975)); Malone v. United States, 502 F.2d 554, 556 (9th Cir.1974). A reviewing court looks to whether the order prohibits "a real and substantial amount of protected conduct in contrast to the statute's legitimate sweep." State v. Riles, 135 Wash.2d 326, 346-347, 957 P.2d 655 (1998). A convicted defendant's freedom of association may be restricted only to the extent it is reasonably necessary to accomplish the essential needs of the state and public order. Id. at 347, 957 P.2d 655 (quoting Riley, 121 Wash.2d at 37-38, 846 P.2d 1365).
¶ 66 Here, the trial court concluded the condition that Warren has no contact with Lisa Warren was warranted because even though Lisa Warren was not a direct victim, she was a witness who testified against Warren. The court also noted:
Despite the fact that she's sympathetic toward Mr. Warren at the very outset of this case it became real clear to the Court by the time everything was said and done, that she totally changed her attitude toward Mr. Warren and was absolutely convinced that she had brought someone into her family that had totally destroyed it.
¶ 67 We conclude the order prohibiting contact with Lisa Warren was directly related to the circumstances of the crime and was not an unconstitutional restriction on Warren's constitutional rights.[12]
¶ 68 We affirm Warren's convictions for one count of child molestation in the first degree of S.S. and three counts of second-degree rape of N.S. and the judgment and sentence.
WE CONCUR: COLEMAN and AGID, JJ.
NOTES
[1] Lisa gave birth to a daughter, H.S., on May 2, 2002.
[2] The State dismissed the rape charge pertaining to S.S.
[3] Warren had prior convictions for murder and promotion of prostitution. Warren's standard range sentence for child molestation in the first degree was 149-198 months; his standard range sentence on each count of rape of a child in the second-degree was 210-280 months. The court sentenced Warren to 198 months for child molestation in the first degree and 280 months on each count of rape in the second-degree to be served concurrently.
[4] Kirkman also involved the testimony of a physician who examined the victim and testified that she gave a "clear and consistent history of sexual touching with appropriate affect." Kirkman, 126 Wash.App. at 102, 107 P.3d 133. This case does not involve similar testimony, and we address Kirkman's analysis only as it relates to the police detective's testimony.
[5] Division Two followed Kirkman's analysis in an unpublished decision, State v. Candia, 128 Wash. App. 1053 (2005), involving similar police officer testimony. The Supreme Court consolidated Kirkman and Candia in granting review of both cases. 155 Wash.2d 1014, 124 P.3d 304 (2005).
[6] The court gave a virtually identical cautionary instruction again at the end of the State's rebuttal argument.
[7] We reject Warren's argument that the prosecutor's misconduct must be reviewed under the constitutional harmless error standard. See State v. Traweek, 43 Wash.App. 99, 108, 715 P.2d 1148 (1986) (if alleged misconduct directly violates a constitutional right, "it is subject to the stricter standard of constitutional harmless error"). Arguments affecting constitutional rights can be cured with a proper instruction to the jury. See State v. French, 101 Wash.App. 380, 385-386, 4 P.3d 857 (2000) (argument suggesting that defense failed to meet their burden to present evidence touched on constitutional right but reviewed under non-constitutional harmless error standard); State v. Klok, 99 Wash.App. 81, 84, 992 P.2d 1039 (2000) (comment on defendant's demeanor at trial touched upon constitutional right but reviewed under non-constitutional harmless error standard).
[8] The court rejected the State's argument that all of the facts pertaining to Warren's conviction were admissible as a "common scheme or plan" under ER 404(b). State v. DeVincentis, 150 Wash.2d 11, 74 P.3d 119 (2003).
[9] Relying on DeVincentis, 150 Wash.2d 11, 74 P.3d 119 (2003), the State contends the evidence was also admissible under the "common scheme or plan" exception to ER 404(b), even though the trial court declined to admit the evidence on this basis. Because we agree with the trial court that the evidence was admissible under the res gestae exception, it is not necessary for us to address the State's argument. We note, however, that it was not necessary for the State to file a cross appeal in order to argue an alternative ground to affirm the trial court's 404(b) ruling. A cross appeal is only required if a respondent seeks "affirmative relief" to modify the decision below. RAP 2.4(a).
[10] The court only allowed the fact of Warren's conviction, not the identity of the victim or the date of conviction.
[11] The trial court overruled the objection.
[12] Warren is not prohibited from having contact with his child, H.S., but is prohibited from having contact with Lisa, N.S. and S.S.