# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67667-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CURTIS LEE HAMILTON, | ) | |
| | ) | |
| Appellant. | ) | FILED: March 11, 2013 |

GROSSE, J. — When a party introduces evidence that would be inadmissible if offered by the opposing party, that party opens the door to the explanation or contradiction of that evidence. Here, Curtis Hamilton repeatedly testified as to the potential prison term he faced if convicted of the crime with which he was charged, despite the trial court's ruling that such evidence is inadmissible. By his testimony, Hamilton opened the door to the admission of evidence of his prior convictions. Hamilton also put his character at issue by his own testimony, again opening the door to the admission of evidence of his prior convictions. The trial court did not abuse its discretion in allowing this evidence. We affirm Hamilton's conviction.

## FACTS

Curtis Hamilton (Hamilton) was convicted of felony violation of a no-contact order prohibiting him from contacting his former wife, Amber Hamilton (Amber). The conviction arose out of an incident that occurred in November 2010. At that time, Amber's friend Dena Carter was living in Amber's house. According to Hamilton, he previously discovered that Carter was using

methamphetamine and selling drugs out of Amber's house. He became concerned about his and Amber's children who lived in Amber's house and told Carter to leave. Because he ordered her out of the house, Hamilton testified, Carter was angry with him.

Early on November 6, 2010, Carter heard Hamilton "ranting and raving" and calling Amber "every name in the book." Amber ran into the bathroom and locked the door. Carter saw Hamilton go to the bathroom door and heard him either hit or kick the door. Carter told Hamilton to get out of the house. Hamilton called Carter names. The two were "chest to chest," and Hamilton hit Carter on the chin with his forearm and threw a glass full of water at her, jamming her finger. Carter again told Hamilton to get out of the house, and this time, Hamilton shoved Carter aside and left.

Amber and Carter locked the door to the house after Hamilton left, and Carter called 911. At trial, Carter testified that Hamilton was living in Amber's house at the time of the incident. Rather than telling the 911 operator that Hamilton lived in the house, however, Carter told the operator that Hamilton "just showed up." She testified that she lied because she was afraid Child Protective Services would remove Amber's children if it became known that Hamilton was living in Amber's house in violation of the protective order. Police responded to the 911 call and took statements from Amber and Carter.

The State charged Hamilton with one count of first degree burglary and two counts of domestic violence felony violation of a court order. The State discovered that Hamilton was actually living at Amber's house, and at the

2

beginning of trial, dismissed the first degree burglary count and added a count of fourth degree assault. The State subsequently amended the charge to include only two counts—domestic violence felony violation of a court order and fourth degree assault.

At trial, Hamilton testified, contrary to Carter's testimony, that he did not live in Amber's house at the time of the incident. The State introduced a recording of a jail phone conversation in which Hamilton told his sister that he did live in Amber's house. Hamilton explained that he knew that jail phone calls were recorded and that the prosecutor would listen to the recording, so he lied and said he lived at Amber's house to avoid a burglary charge. He testified that he would rather be found guilty of violating a protective order than of first degree burglary.

The State played a recording of another jail phone conversation in which Hamilton told Amber's mother to tell Amber's sister that he needed an alibi for November 6 and that he intended to say he was helping the sister babysit a child named Haley.

The trial court allowed the State to introduce evidence of Hamilton's prior convictions, including evidence of convictions the court had earlier ruled inadmissible, because the court determined that Hamilton opened the door to the introduction of that evidence.

The jury found Hamilton guilty of felony violation of a court order and not guilty of fourth degree assault. Hamilton appeals.

## ANALYSIS

The sole issue on appeal is whether the trial court erred in concluding that Hamilton opened the door to the admission of evidence of his prior convictions. When a party introduces evidence that would be inadmissible if offered by the opposing party, that party opens the door to the explanation or contradiction of that evidence.[1] "[A] trial court has discretion to admit evidence that might otherwise be inadmissible if the defendant opens the door to [that] evidence."[2] We review a trial court's determination that a party has opened the door for abuse of discretion.[3] Here, we find no abuse of discretion in the trial court's decision to admit evidence of Hamilton's prior convictions.

Prior to trial, the court granted the State's motion to prohibit the introduction of evidence of the penalty Hamilton faced if convicted as charged. The court also allowed the State to introduce Hamilton's prior conviction of second degree robbery. The parties also stipulated that Hamilton had at least two prior convictions for violating the terms of the protective order. Hamilton has a number of other prior convictions as well that, under the court's order on motions in limine, were not admissible.

After the trial was underway and before Hamilton took the stand, the State renoted its motion in limine "for disclosure of any 404(b), 609, 608, and any kind of character evidence which defense may be offering through the defendant about any other parties, particularly Dena potentially, Dena Carter, or Amber

---

[1] State v. Ortega, 134 Wn. App. 617, 626, 142 P.3d 175 (2006).
[2] State v. Warren, 134 Wn. App. 44, 65, 138 P.3d 1081 (2006).
[3] Ortega, 134 Wn. App. at 626.

Hamilton." The court noted that evidence of Carter's drug use had already been introduced, but that, as to other matters, the order on the motions in limine was still in place.

Notwithstanding the court's evidentiary rulings, Hamilton repeatedly referred to the punishment he would receive if convicted of first degree burglary or violation of the no-contact order. On direct examination, defense counsel asked Hamilton, "What can you tell us about the telephone call that we listened to yesterday?" He responded, "That was stupid on my part. I was desperate. I was terrified of possibly doing 19 years, which is equivalent to second degree murder charge." The State objected, and the trial court stated:

> Hold on just a second. The jury is not concerned, should not be concerned with any punishment that may follow conviction. There is an order that the length of incarceration from any crime is not to be mentioned. You will disregard it.

On cross-examination, the State asked Hamilton, "So again, when you made the phone call that the jury all listened to the other day, what had you personally read about this case? What evidence had you had an opportunity to review?" Hamilton responded, "I researched the first degree burglary with the two counts of violation of no contact order and assault and I added up the time, which is equivalent to a second degree murder charge."

Also, when asked on cross-examination what he meant by saying during his telephone call that he was living at Amber's house, Hamilton testified:

> A    As I said before, that was a mistake on my part. I was scared to death about you trying to give me 200 something months based on all the lies, and you knew they were lies and yet you still - - you're still trying to put me in prison, and you know this woman [Carter] lied five times before she even took the stand, and you still

5

put her on the stand against me. You want me to go to prison that bad, you're going to put a girl on the stand that lied to three police officers, 911 call, an investigator in an interview; you know she perjured herself all those times, yet you still want to put her on the stand. And the reason why she told that lie, because she didn't want my kids to get taken away, yet she's doing meth out of the house; she's got needles in the house; they're selling drugs in the presence --

The State asked Hamilton why he did not simply tell his sister during the jail telephone call that he was not at Amber's house on the night of the incident. Hamilton responded:

A. Like I said before, on the phone call, I did that because I was scared to death of you convicting me of first degree burglary, that I didn't do it.

Q. But --

A. I didn't want -- hold on. You're asking me a question. Let me answer that. I did that, I said I lived there so you couldn't charge me with first degree burglary. I didn't live there. I was scared. You know what, I'm not quite sure you wouldn't have done the same thing you're trying to give me [sic].

THE COURT: Hold on just a second.

[HAMILTON]: 19 years.

THE COURT: Stop. You've answered the question.

[HAMILTON]: I did that because I was scared. I said that because I was scared to death of going to prison. I'm 47 years old. By the time I got out, I'd be almost 70 based on lies. I was desperate. . . .

What's happening to me right now is [Carter's] so mad at me for throwing her out, even the police testified that her demeanor she was angry, not emotionally disturbed, not crying, I mean she was mad. I told her to get out of the pad.

Hamilton again mentioned the prison term he faced if convicted when asked again to explain his jail telephone call:

A. . . . My bad on my part. I apologize. But hey, man, you guys swear by them phone calls, and I was desperate, and I knew you were going to listen to that phone call. I knew you were going to listen to it. That's why I said, hey, I was living there, man. But I wasn't living there. I would rather face a charge of a no contact order violation than pertaining, you know, for 60 months, but then instead of 200 and something months. Wouldn't you, honestly? I'm asking you a question now. If you were in my shoes and someone was trying to put you in prison for damn near the rest of your life based on lies --

Q. What is that based on? You keep talking about so much prison time. Why are you facing so much time?

A. If you research, I'm sure you know the law, any time first degree burglary is involved in a crime, everything is run consecutive. I did a lot of research on it.

[DEFENSE COUNSEL]: Your Honor, I'm going to object. This is nonresponsive.

THE COURT: It is nonresponsive, but he is going way beyond the court orders. And he is introducing items that he should well know are not admissible by my orders, and I told him that that can open up other things. So him having opened up a lot of things that were inadmissible, I don't think, your objections are well taken.

Hamilton continued:

I don't know if I'm correct or not, but I'm not an attorney, but I mean my chances of looking at 60 months compared to what you were trying to give me is hey, man, I made a mistake; you know, like I said, I was scared. You know, you're trying to send me to prison for a ungodly amount of time for a lady that clearly lied to not only to 911 call but to three officers, and I mean the investigator and detective.

At this point in cross-examination, the State questioned Hamilton about the number of points he would receive for sentencing purposes due to his prior convictions. Defense counsel objected, but the court stated: "Counsel, it would be an improper question, had your client not given improper answers, but he gave improper answers, which opens the door to otherwise improper questions."

7

The court decided that because of Hamilton's testimony as to evidence previously ruled inadmissible, all of his prior felony convictions were admissible.[4]

The court also determined that by suggesting that he was the "good guy" compared to Carter, whom he claimed was a drug user, and Amber, whom he claimed allowed drug use and drug dealing around the children, Hamilton also put his character at issue.[5] Accordingly, the court determined that, notwithstanding ER 404(b), Hamilton's prior bad acts were admissible.

We find no abuse of discretion in the trial court's determination that Hamilton opened the door to the introduction of all of his prior convictions. Hamilton repeatedly brought up the prison term he would face if convicted of first degree burglary and/or felony violation of a no-contact order. He did so after numerous warnings from the trial court not do to so. He repeatedly accused the

---

[4] The court stated:

> THE COURT: Counsel, he has taken it way beyond crimes of dishonesty. His testimony to the jury is that the State is being unfair to him and draconian by suggesting that he could serve a lot of time unfairly. I've told him over and over again that the amount of time is not admissible and nevertheless, he keeps talking about it.
> [DEFENSE COUNSEL]: I understand.
> THE COURT: So all his crimes, all his felony crimes, are now admissible, all of them.
> [DEFENSE COUNSEL]: Your Honor --
> THE COURT: The issue -- the issue of punishment is not for the jury. His crimes would not be admissible but for the fact that he keeps telling the jury that the prosecutor is on some kind of vendetta to give him an enormous amount of time in prison.

[5] The court stated: "[H]e's placed his own character into issue. He has repeatedly suggested that he was the one keeping that family together, that people tearing the family apart was his ex-wife and Dena [Carter], and that he was some type of person on the outskirts trying to be the good guy with the good character holding it together and they're the ones with the bad character. I think by inference he has squarely put his character at issue."

State of trying to unfairly punish him based on Carter's lies. He accused Carter of using methamphetamine, selling drugs out of Amber's house with Amber's knowledge and consent, and lying in retaliation for his ordering her out of the house, and claimed he acted out of concern for his children. Hamilton's testimony opened the door to the introduction of his prior convictions.

Affirmed.

WE CONCUR: